RICHARD H. PRITCHETT AND VIRGINIA B. PRITCHETT, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8923-72.    Filed November 13, 1974

*Michel G. Emmanuel* and *Michael D. Annis,* for the petitioners.

*Robert J. Shilliday, Jr.,* for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in the petitioners' Federal income tax for the calendar years 1968 and 1969 and an addition to tax under section 6653(a), I.R.C. 1954, for the calendar year 1969, as follows:

| Year | Deficiency | Addition to tax under sec. 6653(a) |
|------|-----------|-----------------------------------|
| 1968 | $1,955.15 | |
| 1969 | 363,160.48 | $18,158.02 |

The remaining issues to be decided are: (1) Whether certain sales of real property by the petitioners in 1968 and 1969 were sales of properties held primarily for sale to customers in the ordinary course of petitioners' trade or business; (2) whether the sale of the Pritchett and the Pritchett-Longenecker properties constituted a single transaction for purposes of applying the installment sale provisions of section 453, I.R.C. 1954; and (3) whether the petitioners were negligent under section 6653(a), I.R.C. 1954, by failing to report as income in their Federal income tax return for 1969 the excess of the mortgage assumed by the buyer of the Pritchett property over petitioners' basis in this property.

### FINDINGS OF FACT

The petitioners, Richard H. Pritchett and Virginia B. Pritchett, are husband and wife and resided in Fort Myers, Fla., at the time this petition was filed. They filed joint Federal

income tax returns for the taxable years 1968 and 1969 with the director, Southeast Service Center, Chamblee, Ga.

Richard H. Pritchett (hereinafter referred to as Pritchett or petitioner) is a licensed real estate broker in the State of Florida and has been doing business in Fort Myers and Lee County since 1950. During the years in issue, Pritchett's real estate office was located at 2060 McGregor Boulevard, Fort Myers, Fla.

Pritchett was the sole owner of Dick Pritchett, Inc., sometimes also known as Dick Pritchett Real Estate, Inc. The corporation functioned as a real estate brokerage corporation and reported its earnings as ordinary income for Federal tax purposes.

South Gate, Inc., was incorporated in 1957, at which time Pritchett and Jack Welsh were coowners of the corporation. In 1958 Pritchett purchased Welsh's interest and became the sole owner of South Gate, Inc. Petitioner continued to hold all the corporation's stock through the years in issue. Since its inception, South Gate, Inc., has functioned as a real estate subdivider and developer and has reported all of its real estate sales as ordinary income on its Federal income tax return.

During the years involved, Pritchett was a partner in Small Farm Estates which has been in the business of subdividing and selling small tracts of land. Petitioner reported his allocable share of the profits from this partnership as ordinary income on his Federal tax return.

During the years in issue, Pritchett was also a partner in Alexander, Pritchett, Schooley & Welborn, which was a partnership formed in 1965 for the purpose of subdividing, developing, and selling real estate. Some of the property acquired by this partnership was sold as residential lots and the gains on the sales were reported as ordinary income on the partnership Federal tax return. The remaining property was transferred to a corporation named Coral Ridge Gardens, Inc., for the development of a cemetery. Coral Ridge Gardens, Inc., developed the property as a cemetery, sold and continues to sell cemetery lots. The gains realized from the sale of these lots were reported as ordinary income on the corporation's Federal income tax return.

Pritchett and Wilson H. Miller formed a partnership which developed and sold real estate at Fort Myers Beach. This

partnership started in 1954 and was terminated in 1965. Petitioner reported his allocable share of the partnership's profits from the sale of the subdivided lots as ordinary income on his Federal income tax returns during those years.

Pritchett owned 1 share of stock in College Park Acres, Inc. This corporation was in the business of subdividing and selling real estate lots. The income from the sale of these lots was reported as ordinary income on the corporation's Federal income tax returns and petitioner reported his allocable share of the income on his individual returns based on the belief that this corporation qualified as a subchapter S corporation. In 1970, Pritchett sold his 1 share in College Park Acres, Inc., for $3,500.

In his individual name, Pritchett owns substantial income-producing real property, including an orange grove, a cattle ranch, a shopping center, a sod farm, and several small apartments.

Petitioner reported the following income on his 1962 through 1969 income tax returns:

| Year | Adjusted gross income | Gains from real estate sales during year | Gains from installment sales in prior years | Other income and gains from non-real estate assets |
|------|------|------|------|------|
| 1962 | $39,208.30 | $6,773.53 | $27,132.27 | $27,727.59 |
| 1963 | 49,746.89 | 26,062.66 | 21,531.13 | 24,143.45 |
| 1964 | 76,382.31 | 18,303.48 | 24,618.94 | 54,914.48 |
| 1965 | 76,738.00 | 39,669.32 | 22,878.13 | 40,768.52 |
| 1966 | 69,672.21 | 35,351.31 | 46,245.56 | 26,808.21 |
| 1967 | 75,312.67 | 12,262.49 | 23,074.83 | 57,629.19 |
| 1968 | 82,969.57 | 16,590.31 | 27,804.15 | 60,798.20 |
| 1969 | 154,967.62 | 174,337.55 | 18,373.77 | 69,242.14 |

Respondent, in his statutory notice of deficiency dated September 13, 1972, determined that petitioners should have reported income for taxable years 1968 and 1969 as follows:

| Year | Adjusted gross income | Gains from real estate sales | Ordinary income gains from real estate sales | Other income and gains from non-real estate assets |
|------|------|------|------|------|
| 1968 | $86,437.60 | $36,734.70 | $7,659.76 | $60,436.35 |
| 1969 | 638,848.57 | 27,613.32 | 556,079.59 | 69,604.00 |

Pritchett's sales of real estate in 1965 were as follows:

| Parcel No. | Property | Date acquired | Date sold | Gain, loss, or profit received in year of sale |
|---|---|---|---|---|
| 65–1 | ½ interest in .67 acres in Lee County | 8/27/59 | 6/4/65 | $10,579.59 |
| 65–2 | ½ interest in 1.08 acres in Lee County | 8/27/59 | 9/24/65 | 943.16 |
| 65–3 | ⅙ interest in Lee County acreage | 3/30/57 | 4/20/65 | (1,353.58) |
| 65–4 | ½ interest in 62 acres in Lee County | 8/27/59 | 7/9/65 | [1] 2,656.78 |
| 65–5 | 5 acres in Lee County | 10/15/63 | 2/12/65 | [1] 20,271.49 |
| 65–6 | 9/10 interest in 2.5 acres in Lee County | 6/21/65 | 6/24/65 | 6,571.88 |
| | | | | 39,669.32 |

[1] Profit reported using installment basis.

## Pritchett's sales of real estate in 1966 were as follows:

| Parcel No. | Property | Date acquired | Date sold | Gain |
|---|---|---|---|---|
| 66–1 | ½ interest in 160 acres in Charlotte County | 1957 | 10/12/66 | $2,253.23 |
| 66–2 | 26 acres in Lee County | 3/23/66 | 3/23/66 | 1,329.00 |
| 66–3 | 1.08 acres in Lee County | 8/27/59 | 1/17/66 | 1,690.73 |
| 66–4 | Part of lot 45 E. Stadler Farms | 2/60 | 4/20/66 | 13,972.56 |
| 66–5 | Lot in Brooksville, Fla. | 1959 | 12/66 | 59.45 |
| | | | | 19,304.97 |

## Pritchett's exchange of real estate in 1966 was as follows:

| Parcel No. | Property traded | Date acquired | Date traded | Property received | Gain |
|---|---|---|---|---|---|
| 66–6 | Acreage in Lee County | 11/56 | 7/66 | Acreage in Polk County | $15,983.34 |

## Pritchett's sales of real estate in 1967 were as follows:

| Parcel No. | Property | Date acquired | Date sold | Reported gain or profit received in year of sale |
|---|---|---|---|---|
| 67–1 | 9/10 interest 1.69 acres on Bayshore Rd. | 6/21/65 | 1/3/67 | $1,841.36 |
| 67–2 | Lots in Greenville, N.C. | 4/58 | 1967 | 471.50 |
| 67–3 | Mulock Creek property | 9/25/58 | 12/67 | 2,821.75 |
| 67–4 | Lots in East Fort Myers | 1/27/56 | 12/67 | 1,985.18 |
| 67–5 | 6.5 acres-E. 1958 Stadler Farms | 1958 | 1/17/67 | [1] 2,762.70 |
| 67–6 | Buckingham frontage | 1954 | 3/67 | 2,380.00 |
| | | | | 12,262.49 |

[1] Profit reported using installment method.

Pritchett's sales of real estate in 1968 were as follows:

| Parcel No. | Property | Date acquired | Date sold | Reported gain or profit received in year of sale |
|---|---|---|---|---|
| 68–1 | McGregor Blvd. frontage | 9/62 | 7/68 | [2] $2,644.94 |
| 68–2 | South Tamiami Trail property | 4/66 | 3/68 | 3,000.82 |
| 68–3 | North Tamiami Trail property | 4/64 | 2/68 | [2] 4,036.16 |
| 68–4 | Sec. 25-43-25 acreage | 6/65 | 4/68 | [1] 4,658.94 |
| 68–5 | ⅙ interest in Bayshore Rd. property | 5/57 | 5/68 | [2] 2,249.45 |
| | | | | 16,590.31 |

[1] Profit reported using installment method.
[2] Respondent has not challenged petitioners' treatment of these sales as producing long-term capital gains.

Pritchett's sales of real estate in 1969 were as follows:

| Parcel No. | Property | Date acquired | Date sold | Reported gain or profit received in year of sale |
|---|---|---|---|---|
| 69–1 | Part of E 1/4 of sec. 36-44-24 | 1959 1966 | 5/69 | [1] $160,288.88 |
| 69–2 | Industrial land E. Stadler Farms | 1958 | 4/69 | [1] 3,279.15 |
| 69–3 | Land Iona | 1/59 | 10/69 | [1] 1,529.97. |
| 69–4 | Virginia Ave. apt. house | 1967 | 1969 | [2] 9,239.55 |

[1] Profit reported using installment method.
[2] Respondent has not challenged petitioners' treatment of these sales as producing long-term capital gains.

All of the above-listed sales or exchanges of real estate made by Pritchett in the years 1965 through 1969 were reported as capital gain on Pritchett's Federal tax returns. Respondent has challenged four of these sales arguing that the real estate in these transactions did not constitute capital assets in the hands of the petitioner and were not entitled to capital gains treatment.

The first piece of real estate in dispute is known as the South Tamiami Trail property. Pritchett purchased the South Tamiami Trail property, in section 36, township 45 south, range 24 east, identified above as 68-2, from J.H. and Maurine L. Phillips on April 9, 1966, for a purchase price of $27,500. He sold this parcel of land on March 8, 1968, to Tamiami Flower Growers, Inc., at a sales price of $30,810. Tamiami Flower Growers, Inc., was owned by Joseph Povia, a longtime friend of

Pritchett who approached Pritchett and asked to buy the property. Pritchett's basis in this property was $27,809.18 and as a result he realized a gain in 1968 of $3,000.82.

The second piece of real estate in dispute is known as the Gnau or Dill property. On June 21, 1965, Pritchett purchased 60 percent of the west 530 feet of Government lots 1 and 2, section 25, township 43 south, range 25 east, and the west 530 feet of the southwest 1/4 (Government lot 3) of section 24, township 43 south, range 25 east, from Charles Gnau. This property is identifed above as parcels 65-6, 67-1, and 68-4 and will be referred to hereinafter as the Gnau or Dill property. Pritchett held title to this property as trustee under an unrecorded trust agreement. The land is located north of the Caloosahatchee River on Bayshore Road, 1 mile east of the Pritchett home, and consists of 105 acres.

On June 24, 1965, Pritchett, as trustee, conveyed a portion of the Dill property identified above as parcel 65-6, consisting of 2.5 acres of the Bayshore Road property, to Florida Power & Light Co., a public utility which possessed the power of condemnation, for a sales price of $14,490. Pritchett's cost basis in this property was $7,857 and his selling expenses were $61.12, leaving a gain on the transaction of $6,571.88.

On January 3, 1967, Pritchett, as trustee, conveyed the parcel of the Dill property described as 67-1, consisting of 1.69 acres of the Bayshore Road property, to Lee County, a governmental body having powers of condemnation, at a sales price of $2,400.

On April 23, 1968, Pritchett sold the balance of this Bayshore Road property referred to as parcel 68-4, to Leslie V. Dill at a gross sales price of $90,000. The portion of the sales price attributable to his six-tenths interest was $54,000. The terms of sale were $15,000 cash down at closing and a mortgage of $75,000, which was payable over 15 years at a rate of $5,000 a year plus interest at 6 percent. Pritchett received a $4,500 sales commission from Gnau. Pritchett sold this property to Dill only after he had attempted to sell him various properties which were listed with his brokerage firm.

The third parcel in dispute is property known as East Stadler Farms Industrial Land, which consists of lots 25, 36, 37, and 48 in section 25, township 44 south, range 24 east. This property was purchased by Pritchett in 1958 and contains approximately 26 acres. This parcel is identified above as parcel 69-2.

On April 10, 1969, Pritchett sold lots 37 and 48 of this East Stadler Farms property to George E. Adams and Daniel F. Adams for a sales price of $30,000. In 1969 George and Daniel Adams learned from one of their employees that Pritchett owned the property. The Adamses approached Pritchett and offered to buy the property; apparently he had not previously offered the property for sale to anyone.

The fourth and fifth parcels of real estate in dispute are referred to as the Pritchett-Longenecker property and the Pritchett property.

On August 27, 1959, Pritchett purchased the southeast one-fourth of section 36, township 44 south, range 24 east, and the north one-half of the northeast one-fourth of section 1, township 45 south, range 24 east (hereinafter known as the Pritchett-Longenecker property) from W. P. and Margaret G. Hayman. This parcel consisted of 240 acres and the purchase price was $215,200. Pritchett paid the Haymans $50,000 cash on closing and gave a mortgage for the balance.

Pritchett held title to the Pritchett-Longenecker property as trustee under an unrecorded trust agreement. Originally, Pritchett, Jack Welsh, and Tom Longenecker were the beneficial owners of the property; however, due to a subsequent exchange of real estate, Pritchett became the beneficial owner of 50 percent of the property and Longenecker was also a 50-percent beneficial owner.

Between 1960 and 1965, Pritchett, as trustee, conveyed portions of the Pritchett-Longenecker property to Lee County, for extension of Fowler Street through it, and to the City of Fort Myers for the extension of Colonial Boulevard to Fowler Street. The extension of Fowler Street ran north and south through both the Pritchett-Longenecker and the Pritchett properties about 600 feet east of the western line and about 1,800 feet west of the eastern line of those properties. The extension of Colonial Boulevard ran from west to east across the Pritchett-Longenecker property on the line between the southeast one-fourth of 36-44-24 and the north one-half of the northeast $1\frac{1}{4}$ of 1-45-24 to an intersection with Fowler Street.

Petitioner also conveyed a portion of the property to the City of Fort Myers in 1963 for a drainage ditch; and on July 22, 1964, Pritchett conveyed an easement over the Pritchett-Longenecker

property to Florida Power & Light Co. for the purpose of constructing a power transmission line thereon.

After Fowler Street had been extended through the Pritchett-Longenecker property, Pritchett began to sell in smaller parcels all of the land on the west side of this Fowler Street extension. He also sold all of the portion of the property lying south of the section line and designated as the north one-half of the northeast one-fourth of section 1, township 45 south, range 24 east. Between 1962 and 1966, petitioner conveyed the above portions of the Pritchett-Longenecker property in eight separate sales, as set out below.

First, on August 22, 1962, Pritchett sold a portion of the Pritchett-Longenecker property lying west of Fowler Street to J.F. Welborn. Next, on November 18, 1963, he sold another portion of the property lying west of Fowler Street to William B. Thompson, trustee. Also in 1963, Pritchett sold a parcel lying at the southern end of the Pritchett-Longenecker property which is located east of Fowler Street in section 1, township 45 south, range 24 east, to R. D. Robertson.

Pritchett's fourth sale of a parcel occurred on June 15, 1964, when he sold the south 716 feet of the southwest quarter of the Pritchett-Longenecker property lying west of Fowler Street to Al Gallman, trustee.

Pritchett sold three parcels of land from the remaining Pritchett-Longenecker property during 1965. On June 4, 1965, Pritchett sold a portion of the Pritchett-Longenecker property west of Fowler Street in township 45 south, to Norman M. Cox, who was the owner of adjacent property. In addition, on July 9, 1965, Pritchett sold a portion of the Pritchett-Longenecker property lying east of Fowler Street which consisted of the bulk of the north $\frac{1}{2}$ of the northeast $\frac{1}{4}$ of section 1, township 45 south, range 24 east, less three small parcels to Claude E. Taylor, Jr. Finally, on October 28, 1965, Pritchett sold a parcel of land located in the southernmost end of the Pritchett-Longenecker property lying

east of Fowler Street and located in section 1, township 45 south, range 24 east, to Robert A. and Thelma M. Shevitski.

Petitioner made the eighth and final sale of a parcel on January 14, 1966, to Pankow Plumbing, Inc.

No further sales were made from the Pritchett-Longenecker property between January 14, 1966, and May 5, 1969. After the completion of these eight separate sales in January 1966, Pritchett, as trustee, retained substantially all of the southeast one-fourth of 36-44-24 lying east of Fowler Street, consisting of approximately 105 acres. Pritchett carved out and sold the eight separate parcels from the Pritchett-Longenecker property in order to make the payments on the entire tract. He rather colorfully referred to this process as "trimming away the suet to get to the meat."

Although Pritchett never offered to sell his retained portion of the Pritchett-Longenecker property, he apparently received several unsolicited offers to purchase it.

On March 23, 1966, Pritchett purchased the northeast one-fourth of section 36, township 44 south, range 24 east (herein-after referred to as the Pritchett property), consisting of 140 acres, from W. P. Hayman and Margaret G. Hayman for a sales price of $600,000. This property was adjacent to the north of the Pritchett-Longenecker property.

On the same day, Pritchett sold that portion of the Pritchett property lying west of Fowler Street to George E. Adams and Daniel F. Adams for a sales price of $345,000. This property consisted of approximately 36 acres.

Upon completion of the aforesaid sales, Pritchett, individually, and as trustee of the remaining Pritchett-Longenecker property, was left with a single contiguous parcel consisting of the east part of section 36, township 44 south, range 24 east, lying east of Fowler Avenue, containing a total of about 210 acres.

In early 1967, Pritchett began making plans for a trailer park which included both the Pritchett-Longenecker property and the Pritchett property. Toward this end, Pritchett incurred the following expenses:

| Date | Payee | Amount |
|------|-------|--------|
| 1/4/67 | Gerald Smith (re: Adams' survey) | $100.00 |
| 2/1/67 | Amey, Inc. (topos) | 6.18 |
| 3/25/67 | Bldg. Dept. (aerials) | 9.00 |
| 5/22/67 | Chas. Morton (trailer pk. plans) | 250.00 |
| 6/8/67 | Dir. Pub. Admin. Clearing Serv. | 3.09 |
| 7/10/67 | Thos. H. Colcord (prints–proposed mobile park) | 5.40 |
| 7/13/67 | Mobile Home Mfg. Assoc. (books) | 16.30 |
| 7/13/67 | City of Fort Myers (adv.-re: mobile home park) | 35.00 |
| 10/17/67 | Thos. H. Colcord (prints) | 5.40 |
| 10/24/67 | Duane Hall & Assoc. | 1,000.00 |
| 1/5/68 | Duane Hall & Assoc. | 750.00 |
| 3/1/68 | Duane Hall & Assoc. | 750.00 |
| 4/2/68 | T. H. Colcord (S. Fowler prop.) | 7.00 |
| 4/3/68 | Duane Hall & Assoc. | 750.00 |
| 2/2/68 | James Surles (land clearing) | 180.00 |
| 8/5/68 | James L. Kelly (dragline work) ($2,129-½ =) | 1,064.50 |
| 9/16/68 | Holland & Knight (legal releases) ($322.17-½ =) | 161.08 |
| 10/14/68 | Duane Hall Engineering ($399.81-½ =) | 199.90 |

A topographical and boundary survey of the trailer park property, a surveyed plat of the Pritchett and Pritchett-Longenecker property, elevation and layout plans for the Pritchett and Pritchett-Longenecker property, and trailer park plans were prepared for petitioner by various engineers in the latter part of 1967 and the early part of 1968.

Rezoning of the Pritchett and Pritchett-Longenecker properties was necessary before mobile homes would be permitted in the area. The city council for the City of Fort Myers held meetings on September 29, 1967, and October 16, 1967, and approved the planned unit development for the Pritchett and Pritchett-Longenecker property proposed by petitioner. This planned unit development authorized the petitioner to create a trailer park on the Pritchett and Pritchett-Longenecker properties; however, he had to comply with the City of Fort Myers' subdivision ordinance before such trailer park sites could be built. Petitioner had to go to the City with additional drawings and other materials before he could proceed with any development of the Pritchett and Pritchett-Longenecker properties. In the fall of 1967, the Pritchett-Longenecker property and the Pritchett property were rezoned business-2 and remained so zoned until the property was sold in 1969.

Pritchett intended to create a mobile home rental park. Pritchett's plan was to rent mobile home sites while retaining

ownership of the land. Through this scheme, he hoped to generate current income from this land and hold the land until it had greatly appreciated in value. Petitioner thought that a rental mobile home park would afford him great flexibility in control of the land because a rental park would not lock him into long-term leases and would allow him to terminate the park rather quickly and sell the land.

Pritchett's plan for a mobile home rental park never came to fruition because he was unable to arrange financing for this project despite repeated attempts to do so.

Sometime in 1968, George E. Adams offered to purchase the Pritchett property and the retained Pritchett-Longenecker property from the petitioner. This offer was completely unsolicited. In fact, Pritchett never offered to sell this property to anyone.

On November 6, 1968, Pritchett entered into option agreements with George E. Adams and Daniel F. Adams, giving Adams and Adams the right to purchase the Pritchett property and the Pritchett-Longenecker property. These options provided, among other things, that one option could not be exercised unless the other was exercised. In other words, they had to be exercised simultaneously.

On May 1, 1969, Adams and Adams exercised their rights in accordance with the terms of "Option Agreement A" and "Option Agreement B."

By deed dated May 5, 1969, Pritchett sold the remaining portion of the Pritchett property to Adams and Adams for a sales price of $800,000. Pritchett's basis in this land was $266,009.94 after the addition of the capitalized expenses totaling $3,867.37. Closing costs and selling expenses paid by Pritchett were $2,385.10. Pritchett's gain on the sale was $531,605.96. Adams and Adams paid $100,000 to Pritchett as the downpayment on the transaction. Adams and Adams assumed Pritchett's obligations for the existing mortgage on the property to the Haymans, which totaled $447,768.80 at the date of closing the transaction, gave Pritchett a mortgage and 6-percent note totaling $250,000, and $2,231.20 in cash, to cover the balance of the purchase price. Adams and Adams made payments on the note to Pritchett totaling $36,750 in 1969.

By a separate deed also dated May 5, 1969, Pritchett also sold the Pritchett-Longenecker property to Adams and Adams for a sales price of $800,000. Of the total sales price, $400,000 is

attributable to Pritchett's one-half interest in the Pritchett-Longenecker property. His basis in the land was $58,055.57 after the addition of the capitalized expenses totaling $1,425.48. Pritchett's share of the closing costs and selling expenses was $3,188.63. His gain or profit on the sale was $338,755.80. Adams and Adams made a downpayment at closing of $70,000 of which $35,000 was attributable to Pritchett's one-half interest in the property. Adams and Adams gave Pritchett a mortgage and 6-percent note for the benefit of Pritchett and Longenecker totaling $730,000 to cover the balance of the purchase price.

Petitioner was given permission by the executor of the Longenecker estate to make a deal for the Pritchett-Longenecker property.

Charles G. Longenecker paid Pritchett a sales commission of $40,000 in connection with the sale of his one-half interest in the Pritchett-Longenecker property and Pritchett deducted $10,000 from Longenecker's proceeds of the sale with the understanding that the remaining $30,000 would be paid at the rate of $5,000 per year over the 6 years following the sale.

Petitioners reported on their Federal income tax return a gain or profit from the sale of the Pritchett and Pritchett-Longenecker property using the installment method, as follows:

| | |
|---|---|
| Sale price | $1,200,000.00 |
| Cost | $329,647.24 |
| Gross profit | $870,352.76 |
| Contract price | $944,700.40 |
| Gross profit ratio | .9213 |
| Receipts for 1969 | $173,981.20 |
| 1969 realized gross profit | $160,288.88 |

By adding the excess of the mortgage assumed over petitioner's basis in the Pritchett property, or $181,758.86, to the amount petitioner reported as having been received in 1969 a total of $355,740.06 should have been reported as having been received in 1969. Applying petitioners' gross-profit ratio to the latter figure would reflect realized gross profit in 1969 in the amount of $327,724.24, rather than the $160,288.88 reported by petitioners. The difference of $167,435.36 would be omitted from taxation unless included in taxable income in 1969.[1]

---

[1] On brief respondent requests a finding of fact that the mortgage exceeded petitioner's basis in the property by $192,469, and petitioner did not object. We cannot determine how respondent arrived at this figure, anymore than we can determine how petitioner arrived

The negligence penalty asserted is solely attributable to the fact that the petitioners' Federal income tax return failed to recognize as income in 1969 the amount by which the mortgage exceeded the basis in the sale of the Pritchett and Pritchett-Longenecker properties. The return was prepared by certified public accountants who had been furnished with all the information necessary to prepare properly the return.

OPINION

I

The first issue in this case is whether certain parcels of real estate were held by the petitioner primarily for sale to customers in the ordinary course of a trade or business, or were held as investments. The proper characterization of this real estate is essential to determine whether gain realized from its sale should be classified as ordinary income or capital gain.

Section 1221, I.R.C. 1954,[2] defines assets entitled to capital gains treatment in the following manner:

> For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
>
> (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, *or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;* * * * [Emphasis added.]

The Supreme Court, in *Malat v. Riddell,* 383 U.S. 569 (1966), stated that for purposes of section 1221(1) "primarily" means "of first importance" or "principally."

The question whether property is held primarily for sale to customers in the ordinary course of the taxpayer's business is purely factual. *Maddux Construction Co.,* 54 T.C. 1278 (1970). In *Maddux,* we noted:

> Several factors have been enumerated by the courts for the determination of the question, some of which are: (1) The purpose for which the property was initially acquired; (2) the purpose for which the property was subsequently held; (3) the extent to which improvements, if any, were made to the property

---

at the $944,700.40 "contract price" reported on his return. If our figures are wrong, correction can be made in the Rule 155 computations.

[2] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.

by the taxpayer; (4) the frequency, number, and continuity of sales; (5) the extent and nature of the transactions involved; (6) the ordinary business of the taxpayer; (7) the extent of advertising, promotion, or other active efforts used in soliciting buyers for the sale of the property; (8) the listing of property with brokers; and (9) the purpose for which the property was held at the time of sale. See *James G. Hoover,* 32 T.C. 618 (1959); *Ralph J. Oace,* 39 T.C. 743 (1963). None of the above factors are conclusive standing alone, but rather all of the factors taken as a whole govern. *W. T. Thrift, Sr.,* 15 T.C. 366 (1950).

In this case, the respondent has challenged two sales of real estate by petitioner in 1968 and two [3] in 1969. Respondent determined that the petitioner was in the business of buying and selling real estate and that these parcels of land were held primarily for sale to customers in the ordinary course of that business.

Petitioner was a real estate broker, in which capacity he acted as a middleman between buyers and sellers of land, and received commissions for his services which he reported as ordinary income. Petitioner was also an investor in real estate, which respondent tacitly admitted by not challenging the capital gain treatment petitioner accorded to some of his sales of real estate on his returns for the years here involved. Petitioner also admits that in one capacity or another he was a dealer in real estate; but he alleges that he carefully segregated his real estate investments from his dealer activities. He argues that he maintained the dichotomy between his investment activities and his dealer activities by taking title to his investment real estate in his own name, while keeping his "dealer" land in partnerships and corporations. Through the scrupulous maintenance of this distinction, petitioner asserts that a clear and consistent pattern evolves which makes the identification of his investment real estate easy.

It is, of course, well established that even though petitioner is a dealer in land, he still has the right to acquire land and hold it for investment purposes. *Maddux Construction Co., supra; Randolph D. Rouse,* 39 T.C. 70 (1962); *Eline Realty Co.,* 35 T.C. 1 (1960); *Myers v. United States,* 345 F. Supp. 197 (N.D. Miss. 1972), affirmed per curiam 469 F. 2d 1393 (C.A. 5, 1973).

---

[3] The transfer of Pritchett and Pritchett-Longenecker properties will be considered one sale solely for the purpose of determining whether this land was held for investment purposes. The essential events surrounding the transfer of these properties are the same. The question whether the transfer of these properties constituted one or two sales will be considered in connection with whether these properties qualify for installment sales treatment under sec. 453.

The circuit court, in *Municipal Bond Corporation v. Commissioner,* 382 F. 2d 184 (C.A. 8, 1967), noted:

As we interpret *Malat,* a real estate dealer may under appropriate circumstances acquire and hold a tract of real estate primarily for the purpose of investment with the hope of long term appreciation and if such is the case, a subsequent sale is not conclusive on the question of primary purpose in acquiring and holding the real estate.

While the evidence does indicate that when petitioner acquired an interest in land which was subdivided, developed, and sold in lots, this activity was usually conducted in partnership or corporate form, this in and of itself does not prove that petitioner did not also buy other real estate for resale to customers without subdivision or development as a dealer. The apparent segregation of his investment real estate and his dealer real estate is certainly a factor to be considered, but it is not conclusive.

Petitioner has the burden of proving that when he dealt with the parcels of land here involved he was wearing the hat of an investor rather than that of a dealer. *Maddux Construction Co., supra.* This burden must be carried for each sale. Consequently, we must consider each of the four sales separately to determine whether Pritchett acquired and held these parcels of land in question "primarily" or "principally" for sale to customers in the ordinary course of his business or whether he held them for investment purposes.

Our conclusions enunciated below are arrived at by viewing all of the evidence presented in the light of the various factors maintained in the cases cited above.[4]

### a. *Sale of South Tamiami Trail Property to Tamiami Flower Growers, Inc.*

Petitioner acquired this property in April of 1966 from Jim Phillips, who, according to petitioner, simply sat in petitioner's office until he agreed to buy it. Petitioner had no plans for the property when he bought it. Petitioner held this property without doing anything about it for almost 2 years. During that period he did not improve the property, subdivide it, offer it for

---

[4] There was very little discrepancy in the evidence presented. Respondent appears to have determined that all sales of property held by petitioner in his own name for less than 3 years created ordinary income while those held more than 3 years were entitled to capital gain treatment. This is not true of the sale to Adams discussed in d., however. The southern portion of that property had been held by petitioner as trustee for 10 years, and the northern portion by petitioner alone for slightly over 3 years.

sale, post a "for sale" sign on it, advertise it, or list it with his own real estate brokerage company or with any other broker. *Maddux Construction Co., supra.* Petitioner had no specific designs for this property other than holding it to see what happened.

Pritchett finally sold this land in 1968 to Tamiami Flower Growers, Inc., which was owned by Joe Povia, a longtime friend of Pritchett. Povia needed a place to grow flowers with an ample water supply, and a well driller recommended the South Tamiami property. After further inquiry, Povia learned that Pritchett owned this property, and then approached him to determine if he would sell it. Povia's inquiry was completely unsolicited. Pritchett, however, did agree to sell this property as a result of Povia's overture.

Based on all of the evidence pertaining to the South Tamiami Trail property, we think that this real estate was acquired and held by Pritchett for no other purpose than for realization of appreciation in value to be accrued over a substantial period of time. Petitioner made no effort to improve or sell the property. He simply acceded to the request of an old friend. Petitioner apparently did not intend to resell the property immediately after he acquired it. He simply held it passively, allowing it to appreciate. The fact that the taxpayer ultimately sold the appreciated property is not dispositive of the question of primary purpose. *Municipal Bond Corporation v. Commissioner, supra; Scheuber v. Commissioner,* 371 F. 2d 996 (C.A. 7, 1967).

The testimony of Pritchett and Povia shows that it was Povia who pressed for this sale. While we must concentrate on the totality of factors surrounding Pritchett's control of the property, *Maddux Construction Co., supra,* we are not unmindful of the fact that Pritchett never solicited this buyer or any other one for the South Tamiami property. This factor, coupled with the others previously enumerated, leads us inescapably to the conclusion that South Tamiami was an investment for Pritchett, and the gain realized from its sale constitutes capital gain.

### b. *Sale of the Dill Property to Dill*

The classification of the Dill property is a very close factual question; however, we must again conclude that this property was not held primarily for sale to customers in the ordinary course of business.

Pritchett's narrative of the manner in which he sold this property is quite plausible. Petitioner acquired this property in June 1965. In 1968, Dill, the eventual purchaser of the property, was referred to Pritchett by a cousin of Pritchett. Dill was interested in obtaining some riverfront property. Pritchett originally dealt with Dill in his real estate broker capacity. Pritchett initially showed Dill certain properties listed with his brokerage company. None of this land was owned by Pritchett. Dill failed to show any interest in these properties and Pritchett inferred from Dill's lack of interest that the downpayments requested by the sellers were too great. Consequently, Pritchett decided to offer to sell the property in question to Dill at terms he would not refuse if he was in earnest about obtaining riverfront land. Dill accepted the offer of petitioner, and this sale was completed in April 1968.

While the sale of this property did evolve from petitioner's activity as a real estate broker, it is clear that the sale was not made in his capacity as a broker. Nor can it be said that the sale was made by petitioner in his capacity as a dealer. Had he been holding this property for sale to customers, petitioner would surely have offered it to Dill sooner than he did. He did not offer it to Dill until he had apparently exhausted all of the desirable property listed with his brokerage firm. Coupled with this less-than-anxious sale are the facts that although petitioner obtained the land in 1965, he held it for almost 3 years during which time he did not improve it, subdivide it, advertise it for sale, post "for sale" signs on it, or offer it for sale.

The Dill property was not held by Pritchett for sale to customers in the ordinary course of his business and he is entitled to capital gain treatment upon its sale.

### c. *Sale of Lots 37 and 48 of the East Stadler Farms Property to George E. Adams and Daniel F. Adams*

We think this property was held by Pritchett as an investor and, therefore, he is entitled to employ the capital gain sections upon its sale.

Pritchett acquired this property in 1958 and did not sell it until approximately 11 years later. This lengthy retention of the

property is indicative of petitioner's intention to hold it for investment purposes. *Municipal Bond Corporation v. Commissioner, supra; Scheuber v. Commissioner, supra.* As with the previous discussed properties, petitioner never improved or subdivided this land, offered it for sale, posted "for sale" signs on it, or advertised it.

Significantly, this sale was the result of an unsolicited offer to Pritchett from George Adams. In conclusion, based on all of the enumerated factors, we find that this property was held by Pritchett as an investment.

### d. *Sale of the Pritchett and the Pritchett-Longenecker Properties to George and Daniel Adams*

We find petitioner's evidence supporting the claim that this property was held for investment highly persuasive. The factors which show that this property was a capital asset in Pritchett's hands are detailed in the findings of fact and need only be outlined in a cursory manner.

In 1959 Pritchett, as trustee for himself and others, acquired title to the parcel designated the Pritchett-Longenecker property. During 1960, as a result of a conveyance of certain portions of this property by Pritchett to Lee County, Fowler Street was extended through this parcel. Thereafter, between 1962 and 1966, Pritchett sold all of the property west of Fowler Street and all of that in section 1, township 45S, range 24E. He made these eight separate sales of perimeter property to meet the mortgage payments on the entire parcel. Following the last sale in January 1966, petitioner was left with a large symmetrical parcel of land consisting of approximately 105 acres.

In 1966, petitioner purchased the land adjoining the Pritchett-Longenecker property immediately to the north and identified as the Pritchett property. On the same day, he sold the portion of this property on the west side of Fowler Street to George and Daniel Adams. The proceeds from this sale were used as the downpayment on the entire parcel.

In 1966, Pritchett controlled, as trustee and individually, a large contiguous land tract made up of the Pritchett and Pritchett-Longenecker properties. Petitioner was intent on

holding this land as a long-term investment; however, to generate current income from the property, he initiated the development of a mobile home rental park.

Petitioner believed that the income produced by the mobile home rentals would permit him to obtain long-term financing and would also provide the cash flow necessary to meet the mortgage payments. This rental park would also give him great flexibility in selling the land in the future because this park could be rather easily terminated when it became economically expedient to do so.

Pritchett expended a considerable amount of time, effort, and money in promoting his trailer park. He commissioned certain engineering work. He also made several trips, including some to Hartford, Conn., in efforts to arrange financing.

Pritchett encountered great difficulty during 1967 and 1968 in attempting to arrange suitable financing for his trailer park. Sometime in 1968, George Adams approached Pritchett with an offer to purchase this property. On November 6, 1968, petitioner entered into two option agreements with George and Daniel Adams giving them the right to purchase the Pritchett and Pritchett-Longenecker properties simultaneously. On May 1, 1969, the Adamses elected to exercise the options and on May 5, 1969, the sales were consummated.

Adams' offer was completely unsolicited. Pritchett had never offered to sell this land to anyone. Indeed, he never advertised it or placed a "for sale" sign on it. Pritchett's sole activity with this contiguous tract of land from 1966 until sometime in 1968 had been directed toward developing it as a rental mobile home park. Pritchett was still attempting to develop this project when he received the offer from Adams. We must, therefore, conclude that this property was held "principally" for investment purposes.

## II

The second issue involves the sale at the same time of the two contiguous parcels of land, identified as the Pritchett and Pritchett-Longenecker properties, to the same purchasers, George and Daniel Adams, last discussed above. The question to be determined is whether this transaction is to be considered two

separate sales for the purpose of section 453,[5] in which case only the sale of the Pritchett-Longenecker property would qualify for installment sales treatment under that section of the Code, or whether it should be treated as one sale, in which case all the proceeds of the sale could be reported by the installment method.

Respondent argues that the sale of these properties should be viewed as separate transactions. Following this argument, he determined, in his notice of deficiency, that the selling price of the Pritchett property was $800,000. He also concluded that petitioner received in payment for this property, in the year of sale, cash in the amount of $138,981.20 and the amount of the excess of petitioner's mortgage on this property which was assumed by the Adamses over petitioner's basis in the property, $181,759.86. This excess of assumed mortgage over basis is includable in determining the amount received in the year of sale for purposes of determining whether the taxpayer can employ section 453. *R. A. Waldrep,* 52 T.C. 640 (1969), affirmed per curiam 428 F. 2d 1216 (C.A. 5, 1970); sec. 1.453-4(c), Income Tax Regs. See *Burnet v. S & L Building Corp.,* 288 U.S. 406 (1933).

Section 453(b)(2)(A)(ii) declares that the installment method of reporting income can be used only if, in the taxable year of sale, the payments received by seller do not exceed 30 percent of the selling price. Under respondent's computations, 30 percent of the

---

[5] SEC. 453. INSTALLMENT METHOD.

(a) DEALERS IN PERSONAL PROPERTY.—

(1) IN GENERAL.—Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

\* \* \*

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—

(1) GENERAL RULE.—Income from—

(A) a sale or other disposition of real property, \* \* \*

may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).

(2) LIMITATION.—Paragraph (1) shall apply—

(A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition—

(i) there are no payments, or

(ii) the payments (exclusive of evidence of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

selling price of the Pritchett property is $240,000 ($800,000 × .30). Petitioner, however, received, in the year of sale, payments of $138,981.20 ($100,000 + $2,231.20 + $36,750) in cash and $181,759.86 as the excess of the assumed mortgage over basis, or a total of $320,741.06. Since this figure exceeded the allowable payment, respondent determined that section 453 was not applicable to the Pritchett property.

Petitioner challenges the respondent's segregation of the Pritchett property from the Pritchett-Longenecker property. Under his theory, both parcels were the subject of one sale for the purposes of section 453. Since the sale of these parcels was one integrated transaction, the sales price for computation under the installment sales method was $1,200,000. Petitioner does not dispute respondent's determination that in the year of sale, he received $320,741.06 on the Pritchett property. His position is that he received that amount plus an additional $35,000 on the Pritchett-Longenecker property in the year of sale. He readily admits to receiving $355,741.06 as payments, but argues that since the total sales price was $1,200,000, he received less than 30 percent of the sales price in the year of sale and is entitled to employ section 453.

The question whether the disposition of the Pritchett and Pritchett-Longenecker properties constituted one or two sales under section 453 is largely one of fact. *Farha v. Commissioner,* 483 F.2d 18 (C.A. 10, 1973), affirming 58 T.C. 526 (1972); *Veenkant v. Commissioner,* 416 F.2d 93 (C.A. 6, 1969), affirming a Memorandum Opinion of this Court, certiorari denied 397 U.S. 1029 (1970); *Charles A. Collins,* 48 T.C. 45 (1967). However, where two parcels of real estate are involved we believe we must also consider the language used in section 453 and the purpose for which the statute was enacted.

The statute is not couched in terms of the income received from one transaction in real property, but rather in terms of the income received from a sale of real property. The installment-reporting provisions are available only if the payments received in the year of sale do not exceed 30 percent of the selling price of the real property. If the sale qualifies for installment reporting, the computation of the taxable income received each year requires a determination of the gross profit realized on the sale,

which involves the selling price and the adjusted basis of the seller in the particular real property. And if, as here, a mortgage is assumed as part of the purchase price, any excess of the mortgage assumed over the seller's basis in the particular property must be included as an amount received in the year of sale for purposes of the 30-percent computation. Section 1.453-5, Income Tax Regs., provides that the sale of each lot or parcel of a subdivided tract must be treated as a separate transaction and gain or loss computed accordingly.

We believe the statute clearly contemplates that when two parcels of real property are sold using separate documents to witness the transfers, the accounting for purposes of section 453 must be made with respect to each separate parcel, even though the two parcels are sold as a part of the same transaction, absent some strong reason for treating the sales as one.[6]

We do not question petitioner's testimony that he considered the two parcels of real estate as one tract and that he would not have sold one parcel without selling the other. But this does not mean that the sale of the two parcels must be considered as a sale of one parcel for purposes of section 453. Petitioner did not structure the transaction as a sale of a single tract. While it is true that we normally look to the substance of a transaction rather than its form, if a taxpayer asserts that the substance is different than the form he used, he must furnish strong proof that the substance was other than the form indicates. *Ullman v. Commissioner,* 264 F. 2d 305 (C.A. 2, 1959); *J. Leonard Schmitz,* 51 T.C. 306 (1968), affirmed sub nom. *Throndson v. Commissioner,* 457 F. 2d 1022 (C.A. 9, 1972). We do not find that petitioner has carried his burden of proof.

There was ample reason, as petitioner appears to admit, why the transaction between petitioner and the Adamses took the form of two separate sales.

The two tracts of land were acquired by petitioner at different times. Petitioner owned the Pritchett property outright and had his own basis in that property. Petitioner owned only a one-half interest in the Pritchett-Longenecker property at the time of the

---

[6] We are not deciding that an owner of real property cannot sell two contiguous parcels of real estate and have it considered as one sale for purposes of sec. 453, but when the transaction is structured as two separate sales, with all the essential ingredients of a sale being separated into two distinct parts, we do not believe the two parts can arbitrarily be lumped together for purposes of sec. 453.

sale and petitioner's basis in this property probably differed from Longenecker's basis in the property. From Longenecker's standpoint, the transaction cannot be viewed as an integrated sale of the entire tract. There was an unpaid mortgage of sizable amount on the Pritchett property whereas the Pritchett-Longenecker property was free of any mortgage at the time of the sale.

While the selling price of each parcel was the same, nevertheless there were two separate selling prices. Furthermore, the provisions for payment thereof were necessarily quite different and two entirely separate sets of documents were utilized to record the transactions. Two deeds were executed, one by Pritchett in his individual capacity, and the other by Pritchett in his capacity as trustee for himself and Longenecker. For the Pritchett property the purchasers paid $102,231.20 in cash, assumed the balance of $447,768.80 due on the existing mortgages, and gave Pritchett a note secured by a second mortgage for $250,000, on which they made payments in the year of sale totaling $36,750. This note was secured by a mortgage on the Pritchett property alone. For the Pritchett-Longenecker property the purchasers made a downpayment in cash of $70,000 and gave a note secured by a mortgage on that property alone in the amount of $730,000. No payments were made on that mortgage during the year of sale. Additionally, it is stipulated that Pritchett incurred different closing costs and selling expenses with respect to the two properties and separate closing statements were prepared for each property.

Petitioner argues that because the two options given to the Adamses to purchase the separate parcels were exercisable only simultaneously, this provides the nexus for treating the sales as one sale of one property. We disagree. As heretofore mentioned, all this did was assure petitioner that one property would not be sold without the other. The fact that two options instead of one were given suggests that the parties recognized that there were two separate properties involved.

It is not clear from the record why the transaction was structured the way it was unless petitioner or his advisers recognized the problems involved in trying to pattern it as a sale of one property. We would assume from the fact that petitioner had sold other properties on the installment basis that he was cognizant of the requirements for installment reporting under section 453,

and had he wanted to be more certain that this transaction would be considered the sale of one property, he would have tried to arrange it differently. However, we also recognize that even treated as separate sales of separate properties both would have qualified for installment reporting were it not for the fact that the excess of the mortgage assumed over petitioner's basis in the Pritchett property must be included in the amount received in the year of sale, a fact which petitioner overlooked in reporting this transaction on his 1969 return.

For the first time on brief petitioner argues that even if the sales do not qualify for installment reporting under section 453, the promissory note in the amount of $250,000 given by the Adamses to Pritchett as part of the purchase price does not constitute other "property" within the meaning of section 1001(b) of the Code, and need not be included in income of a cash basis taxpayer in the year of sale. The argument is based on the theory that the note was not negotiable under Florida law and had no market value but simply reflected the purchasers' obligation to pay in the future. We need not consider this issue because, having been raised for the first time on posttrial brief, it is too late. See Rule 34(b)(4), Tax Court Rules of Practice and Procedure; *Eleanor C. Shomaker*, 38 T.C. 192 (1962). Furthermore, as would be expected, there is no evidence in the record that would support petitioner's argument.

We conclude that under the facts and circumstances relative to this transaction, it must be considered as sales of two separate parcels of real estate for purposes of section 453; and upon such consideration the sale of the Pritchett property does not qualify for installment reporting under that section.

III

The final issue herein raised is whether the petitioner is liable under section 6653(a)[7] for the addition to tax which the

---

[7] SEC. 6653. FAILURE TO PAY TAX.

(a) NEGLIGENCE OR INTENTIONAL DISREGARD OF RULES AND REGULATIONS WITH RESPECT TO INCOME OR GIFT TAXES.—If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.

respondent has determined. Section 6653(a) provides for an addition to tax if an underpayment is due to negligence or intentional disregard of rules and regulations.

In preparing Pritchett's income tax return for 1969, his accountant erroneously failed to include the excess of the mortgage on the Pritchett property over the basis for the property in income for that year. As a result, the amount by which the assumed mortgage exceeded petitioner's basis, $181,759.86, was omitted from the income tax return as filed by petitioner.

Respondent's determination that petitioner's failure to report this amount was negligent is prima facie correct and casts the burden upon petitioner to prove that the imposition of the addition to tax was erroneous. *Herbert Enoch,* 57 T.C. 781 (1972); *Leroy Jewelry Co.,* 36 T.C. 443 (1961).

Pritchett furnished the accountant with all the necessary information to prepare properly this return. This information included copies of the option for the Pritchett property and the closing statement for the sale of this land. These items contained the raw data from which the excess of the assumed mortgage could have been calculated.

The general rule is that the duty of filing accurate returns cannot be avoided by placing responsibility on an agent. *Herbert Enoch, supra; James Soares,* 50 T.C. 909 (1968); *American Properties, Inc.,* 28 T.C. 1100 (1957); *Vern W. Bailey,* 21 T.C. 678 (1954). There is, however, an indication in some cases that a petitioner may insulate himself from the negligence addition to tax if he furnishes the necessary information to his agent who prepared the return. *Arnold G. Pessin,* 59 T.C. 473 (1972); *Herbert Enoch, supra; Leo A. Woodbury,* 49 T.C. 180 (1967).

We are, nevertheless, convinced that a deviation from the general rule is not warranted in this particular case. Petitioner must bear the ultimate responsibility for any negligent errors of his agent. *American Properties, Inc., supra.* We do not believe he should be allowed to sidestep such responsibility by simply alleging that he supplied the correct information to his agent and relied fully upon him. We are not unmindful of the fact that recognition of this item of income in this case requires a fair degree of expertise and sophistication in the tax field. However, the onus is placed upon the taxpayer to file correct tax returns. Petitioner had used the installment method of reporting gains on

sales of real estate on numerous occasions and both he and his accountant should have been familiar with the requirements of section 453. In making the computations of the amounts to be reported on this transaction for 1969 a careful perusal of the regulations would reveal that the excess of a mortgage assumed over petitioner's basis in the property should be included in the amount received in the year of sale. Pritchett admitted that he carefully reviewed his tax returns prepared by his accountant.

We realize that this omission was an oversight on the part of both the accountant and petitioner. We do not believe it was either intentional or due to a misunderstanding of the law. Nevertheless, this was a large amount which should have been noticed and which may have escaped tax altogether if not included in petitioner's income for 1969.

In light of these circumstances, we think petitioner cannot insulate himself from the negligent omission of this item from his return but must stand ready to accept the ultimate blame. *American Properties, Inc., supra.* We sustain respondent on this issue.

*Decision will be entered under Rule 155.*