A. ROWLAND BOUCHER AND MARY K. BOUCHER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Boucher v. Commissioner
Docket No. 10796-75.
United States Tax Court
T.C. Memo 1979-172; 1979 Tax Ct. Memo LEXIS 351; 38 T.C.M. (CCH) 730; T.C.M. (RIA) 79172; May 1, 1979, Filed *351 John DeBruyn, for the petitioners. John D. Moats, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined deficiencies in petitioners' income tax and an addition to the tax under section 6653(a) [1] as follows: Year
Deficiency
6653(a) Addition
1967
$ 12,355.72
$ 0
1969
257,871.06
0
1970
86,195.33
4,309.77
Due to concessions by petitioners, the only issues remaining for decision are: 1. Whether $75,000 received by petitioners in 1970 should be taxed as ordinary income or as capital gain. 2. Whether any part of petitioners' underpayment of tax in 1970 was due to negligence. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. At the time they filed their petition, petitioners were residents of Cherry Hills Village, Colorado. Mary K. Boucher is a party only by virtue of having filed joint returns with her husband. When we hereafter refer to petitioner, we will be referring to A. Rowland Boucher. Petitioner was *352 the president of King Resources Company. John King ("King"), a Denver oilman, owned 16 percent of the stock of King Resources Company and was chairman of its board of directors. Indirectly, he controlled the corporation. International Resources Limited was a subsidiary of King Resources Company; James Tocher was president of International Resources Limited. On December 30, 1968, King purchased from Bernard Cornfeld 15,000 shares of stock of Investors Overseas Services, Ltd. ("I.O.S.") for $27.50 per share, or a total purchase price of $412,500. At the time he purchased the stock of I.O.S., King signed a letter of intent stating that he acquired this stock for investment and "not with a view to the public resale or distribution" of the shares. By July 3969 the I.O.S. stock which King had purchased was worth approximately $40 per share. Sometime in early 1969 King decided to transfer this stock to his children. King had previously established a Bahamian trust for the benefit of his children with the Mercantile Bank and Trust Company Limited as trustee ("Bahamian Trust"). Prince von Hesse, a friend of King's, established another Bahamian trust ("Prince von Hesse Trust") for *353 King's children sometime after July 1, 1969. King decided sometime after July 1, 1969, that in order to effectuate the transfer of the I.O.S. stock to his children, he would transfer the stock to one of the trusts. Although King desired to transfer the I.O.S. stock to the trusts, he did not want to pay either gift tax (if the stock was transferred outright) or income tax (if the stock was sold to the trusts at a gain) in connection with this transfer. To avoid such taxes, King decided to employ a two-step plan. First, King decided he would grant options to purchase some of the I.O.S. stock to petitioner and Tocher. These options would give petitioner and Tocher the right to purchase 7,500 and 2,500 shares of the I.O.S. stock, respectively, for the price which King had paid for the stock. The second step called for petitioner and Tocher to sell their options to one of the children's trusts for $10 per share. Although King decided to use this "two-step" transaction sometime in early 1969 and told petitioner and Tocher something of his plan, he did not put anything in writing at that time. In August 1969 King explained his plan to his attorney. In confirmation of this conversation, *354 his attorney wrote King a memorandum on August 30, 1969, in which he set out the plan as described to him, some problems with the plan, and his views of the tax consequences of the various proposed steps. At this time, however, no written options or transfers to the trust had been drafted. Pursuant to King's instructions, in September or October 1969 his attorney drafted documents entitled "Grant of Option" and "Assignment of Option." The Grants were dated "as of" December 31, 1968; the Assignments were dated "as of" July 1969. The attorney dated these documents pursuant to instructions from King. According to these documents, in December 1968 petitioner and Tocher were granted options to purchase 6,429 and 2,142 shares, respectively, of I.O.S. stock from King for $27.50 per share. As consideration for the options, petitioner and Tocher agreed to pay King all interest expense King incurred borrowing money to buy the I.O.S. stock. Again, according to the documents, they then assigned these options in July 1969 to the Bahamian Trust for $75,000 for petitioner and for $25,000 for Tocher. Although the signatures of petitioner and Tocher appear on the documents entitled "Grant of *355 Option," neither remembers signing the documents. Petitioner first remembers seeing the "Grant of Option" in June 1972 when it was shown to him by a special agent. However, his signature appears to be genuine. In addition, neither Tocher nor petitioner remembers signing the "Assignment of Option" which bears each one's name. Although King had informed petitioner and Tocher that they might be participants in a "deal" involving the I.O.S. stock in the beginning of 1969, he gave neither individual any details of the "deal." In January 1970 King told petitioner that the "deal" was closed and gave petitioner $75,000. At that time, petitioner believed that he had sold some I.O.S. stock (he did not know the price or number of shares) to King. In fact, petitioner had (according to the documents) conveyed his Option to the Bahamian Trust. Tocher was told in August 1970 that he was to receive $25,000 for his participation in the "deal" with King, but he never received this payment. Tocher did not request payment from King because he "didn't know why [he] was entitled to receive the money." On his 1970 tax return petitioner did not report the $75,000 payment he received from King. *356 Petitioner did not keep his own financial records but had his secretary keep them for him. Petitioner's secretary gave petitioner's records to his accountant, who prepared petitioner's tax returns on the basis of those records. Petitioner signed his returns. In the statutory notice, respondent determined that in 1970 petitioner received $75,000 from King which was not reported; respondent further determined that this payment was ordinary income. Respondent also determined that part of petitioner's underpayment of tax in 1970 was due to negligence. OPINION The first issue is whether $75,000 received (but unreported) by petitioner should be taxed as ordinary income or capital gain. Petitioner contends that he received this payment for the sale of a capital asset (an option) held for more than six months. Respondent, on the other hand, contends that the option and assignment thereof was a "sham" and that petitioner was paid $75,000 by King for the use of his name in King's transfer of the stock to the children's trusts. In the alternative, respondent contends that if a valid option existed, petitioner held the option for less than six months. In December 1968 King purchased *357 unregistered stock of Investors Overseas Services, Ltd. ("I.O.S"). When the stock appreciated during the ensuing months, King decided to transfer this stock to his children. In order to avoid incurring income or gift tax on the transfer, King allegedly created a "two-step" transaction. First, he "granted" petitioner and Tocher options to purchase some of this stock at the price King had paid for it; second, petitioner and Tocher allegedly conveyed the options to trusts established for the benefit of King's children. King had his attorney draw up documents in September or October of 1969 evidencing this transaction. The options were dated as of December 1968 and the assignments were dated as of July 1969. The facts in this case do not support the existence of either the options or the assignments of those options as contended by petitioner. Whatever "plan" King had in mind for transferring his I.O.S. stock to his children or trusts for their benefit, it was not in existence as of December 1968, the date indicated on the "Grant of Option" documents, and it possibly was no more then a vague idea in King's mind until he consulted with his attorney about it in August 1969. He *358 did mention to petitioner and Tocher before July 1969 that he was including them in on a "deal" regarding I.O.S. stock, but beyond that they knew practically nothing. The form of the deal, the amount of stock involved, and the assignee of the options were all uncertain as late as August 30, 1969. In September or October of 1969 King instructed his attorney to draft documents recording the deals he had supposedly made with petitioner and Tocher earlier in the year. As instructed by King, his attorney drafted documents entitled "Grant of Option" which indicated that as of December 31, 1968, King had granted an option to petitioner to acquire 6,429 of King's shares of I.O.S. stock at King's purchase price. In consideration for the options, the instrument recited that petitioner was to pay King's interest expense incurred in acquiring the stock subject to the option. A similar "Grant of Option" for 2,142 shares was prepared for Tocher. Neither petitioner nor Tocher remembers signing these options or even having seen them before being presented with them by one of respondent's special agents. King's attorney also drafted documents entitled "Assignment of Option" in accordance with *359 King's instructions. According to the assignments, petitioner and Tocher assigned their options to a trustee of King's children's Bahamian Trust for $75,000 in petitioner's case and $25,000 in Tocher's case. King paid petioner the $75,000 in January 1970. In August 1970 he told Tocher he owned him $25,000 in connection with the I.O.S. stock deal, but never paid Tocher. Since Tocher was not clear why he was entitled to the $25,000, he never asked King for payment. Petitioner took the $75,000 believing it represented gain from the sale of I.O.S. shares (number unknown) by him to King. However, he did not report the $75,000 on his 1970 income tax return. He now agrees he should have included the $75,000 on his return, but contends it represents payment for the assignment of the option as set forth in the documents drafted by King's attorney. We conclude that the facts presented in this case do not permit us to hold that petitioner has met his burden of proof. Petitioner has not shown the existence of a valid option or assignment of option. In fact, the evidence indicates a lack of definiteness as to all of the terms of the alleged option. See Stice v. Peterson,144 Colo. 219, 355 P. 2d 948 (1960); *360 American Mining Co. v. Himrod-Kimball Mines Co.,124 Colo. 186, 235 P. 2d 804 (1951). We therefore conclude that petitioner's $75,000 was ordinary income. We need not decide whether petitioner was paid, as respondent alleges, for lending his name to King in King's efforts to avoid the payment of any taxes on the transfer of his I.O.S. stock to his children's trusts. It is enough that he was not paid for the sale of any capital asset. Under the circumstances we sustain respondent's contention that the $75,000 in issue is ordinary income to petitioner. The next issue is whether any part of petitioner's underpayment of tax in 1970 was due to negligence. Section 6653(a) provides for an addition to the tax of 5 percent of the underpayment where any part of such underpayment is due to negligence or intentional disregard of the rules and regulations of the Internal Revenue Code. The burden of proof rests on petitioner to rebut respondent's determination. Bixby v. Commissioner,58 T.C. 757, 791 (1972); Rule 142(a), Tax Court Rules of Practice and Procedure.
In this case petitioner failed to report the $75,000 payment which he received from King *361 on his 1970 tax return. As justification for this failure, petitioner notes that his secretary kept his financial records and that she gave these records to his accountant, who prepared petitioner's tax return for him. Accordingly, although he signed the return which did not report this income, petitioner contends that this understatement of income was not due to negligence. We disagree. It is well-established that the duty of filing accurate returns cannot be avoided by placing the responsibility on an agent. Ma-Tran Corporation v. Commissioner,70 T.C. 158, 173 (1978); Pritchett v. Commissioner,63 T.C. 149, 174 (1974). Although there is an indication in some cases that a taxpayer may insulate himself from the negligence penalty if he furnishes all the necessary information to his agent, id., in this case there is no evidence that petitioner furnished any information regarding this payment to his accountant. Given the size of this payment, petitioner's apparent failure to supply information regarding it to his accountant was, at best, due to petitioner's negligence. Accordingly, we sustain respondent's determination of an addition to the *362 tax under section 6653(a) for 1970. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩