CHARLES HOMER ROBERTSON and CARALEE ROBERTSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Robertson v. Commissioner
Docket No. 7987-79.
United States Tax Court
T.C. Memo 1984-176; 1984 Tax Ct. Memo LEXIS 499; 47 T.C.M. (CCH) 1468; T.C.M. (RIA) 84176; April 5, 1984. *499 Held: Petitioners were not in the real estate business in 1973; they failed to demonstrate error in respondent's computation of loss on sale of a silo; income from lot sales in 1974, 1975 and 1976 redetermined; claimed embezzlement loss in 1976 disapproved. Shalle Stephen Fine, for the petitioners. Jani E. Maurer, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: The Commissioner determined deficiencies in petitioners' income tax liability and additions to tax for the years and in the amounts as follows: Additions to Tax
Year
Deficiency
Sec. 6653(a) [1]
Sec. 6651(a)(1)
1972
$8,759.14
$437.96
1973
120,756.98
6,037.85
1974
1,937.11
96.86
1975
10,222.98
511.15
$1,805.75
1976
24,611.81
1,364.84
6,824.20
After concessions, four issues remain for our determination: (i) Whether real property sold by petitioners in 1973 was a capital asset or property held for sale in the ordinary course of business; (ii) the amount of the long-term capital loss realized by petitioners in 1973 on the sale of a silo; (iii) whether petitioners are taxable on proceeds (including interest *500 on deferred installments of principal) from the sales of lots in 1974, 1975 and 1976, which proceeds were received by petitioners' agent but not remitted to petitioners; and (iv) whether petitioners suffered a deductible loss in 1976 as a result of the failure of said agent to remit such proceeds. For convenience, our Findings of Fact and Opinion with respect to each of the issues have been combined, with our discussion of issues (iii) and (iv) also combined. [2]
Some of the facts have been stipulated and they are so found. At the time of the filing of the petition, petitioners resided in Miami, Florida. They timely filed joint Federal income tax returns for the taxable years 1972, 1973 and 1974. Their joint Federal income tax returns for the year 1975 and 1976 were not filed until October 11, 1977. Throughout his life, petitioner Charles H. Robertson (Robertson) was a professional gambler. [3] *501 There is no evidence that Mrs. Robertson was ever engaged in any business. Issue I
In 1958 petitioners purchased 438 acres of real property located in Fulton County, Georgia (the Georgia Property). This property was sold at a profit in 1973, with the sale reported as a long-term capital gain installment sale. Petitioners now seek to have us reclassify the sale proceeds as ordinary income by reason of Robertson being a dealer or trader in real estate. At sometime prior to 1963, Robertson contemplated a development of the Georgia Property, presumably by subdivision into lots and then sale, but that plan was abandoned by him because of problems related to his proposed financing. [4] It seems unlikely that Robertson's activities in the proposed or contemplated land development plan would have risen to the level of a trade or business, but that plan was abandoned and along with it any trade or business activity which it involved. From 1958 to 1972, Robertson's brother lived on the property, without payment of rent, operated a grocery store *502 and bait shop and utilized some of the lakes situated thereon for recreational fishing and renting boats to members of the public. [5] The property was also used for cattle grazing. The brother paid the real estate taxes on the property and the expenses of his activities. The brother continued to live on the Georgia Property after the sale. In 1972, petitioners leased the Georgia Property to four individuals with an option to purchase at a price of $900,000. On October 25, 1973, the lessees *503 exercised the option to purchase. The sale was closed in December 1973, with the payment of $295,000 in cash and a note for $605,000 (the Georgia Note) secured by a deed to secure debt (the Georgia Mortgage). By prior agreement of Robertson, the purchasers borrowed $400,000 from the Federal Land Bank of Columbia, Columbia, South Carolina, secured by a first lien on the Georgia Property. [6] This $400,000 provided the purchasers with their $295,000 cash down payment. Development and resale of the Georgia Property was contemplated by the purchasers. Petitioners realized a gain of $496,883 on the sale which they incorrectly treated as an installment sale. Respondent eliminated the installment sale treatment, treating the entire capital gain as taxable in 1973. Petitioners now contend that the Georgia Property was not a capital asset as a predicate for claiming an ordinary loss in 1976, the year in which petitioners claim the Georgia Note became worthless. [7] *504 From the date of purchase in 1958 to the sale in 1973, petitioners held the Georgia Property as a capital asset, described in section 1221. There is simply no evidence that this property was held for sale in the ordinary course of a business. Petitioners' reference to Malat v. Riddell,383 U.S. 569 (1966) is inapposite. An intention in the early 1960's to try to develop this property, which intention was abandoned at least a decade prior to the sale, is of no significance. The status of property, whether or not a capital asset, is a question of fact. Commissioner v. Tri-S Corporation,400 F.2d 862, 864 (10th Cir. 1968), affg. 48 T.C. 316 (1967). See generally Newman v. Commissioner,T.C. Memo. 1982-61. We recognize that in the years 1974, 1975 and 1976 petitioners sold certain lots in Dade County, Florida, referred to by the parties as the "Treasure Island" lots, and the sale proceeds, which were not reported by petitioners, were treated by respondent as ordinary income. Presumably, respondent concluded that petitioners in those years were holding that particular property for sale in the ordinary course of business. [8] *505 Petitioners did not contest this point and oddly enough respondent on brief argues that the "Treasure Island" lots were not handled in a manner "consistent with a real estate business." In any event, it is too well established to warrant further comment that an individual may be in the real estate business with respect to certain real property and may hold other real property at the same time as an investment. See, Pritchett v. Commissioner,63 T.C. 149, 163 (1974). We hold against petitioners with respect to the character of the 1973 sale of the Georgia Property. The facts remain, however, that petitioners suffered losses with respect to the Georgia Note and Georgia Mortgage and with respect to certain of this Dade County, Florida, property. We now consider whether any of these losses had tax consequences during any of the years before the Court based upon the facts before us. One such loss was alleged to have arisen by reason of a guarantee arrangement involving petitioners and The Chandelier of the Virginia Playhouse, Inc. (the Chandelier). It was incorporated in 1973. Petitioners' daughter was an officer, *506 director and employee, but not a shareholder. Robertson could not be a shareholder of record, although he claimed to own an interest in the corporation. His actions were consistent with the fact of equity ownership, but there is no necessity for our determination of this fact. This corporation operated a bar or lounge in Miami, Florida. Petitioners through their daughter loaned substantial funds to the corporation and in the summer of 1974 petitioners guaranteed an indebtedness of the corporation to a Miami bank (the Bank), assigning the Georgia Note and Georgia Mortgage as additional security. In December of 1975, the Bank filed suit against the corporation, petitioners and others, seeking to enforce against petitioners their guaranty because the indebtedness of the corporation to the bank was alleged to be in default. That same month, petitioners made demand on the Bank to take action to foreclose the Georgia Note and Georgia Mortgage, which was then delinquent. In March 1976, the Bank secured a judgment against petitioners in the amount of $115,638.17, representing the principal of the guaranteed debt plus interest, costs and attorneys' fees. Foreclosure proceedings as to *507 the Georgia Note and Georgia Mortgage were commenced. They were followed by negotiations between petitioners and the Bank with respect to salvaging some value out of the Georgia Property. These negotiations continued into the year 1977. In May 1977, the Georgia Property was sold to the Bank under the power of sale contained in the Georgia Mortgage. The Bank continued its collection efforts, with levies upon property belonging to petitioners in Dade County, Florida. Some levies were not made final until 1979. There is no evidence in this record of any effort by petitioners to cause the Chandelier, its stockholders or petitioners' daughter to pay any part of the indebtedness to the Bank, which was guaranteed by petitioners; neither is there any evidence that the Chandelier or its shareholders were insolvent. In fact, the Chandelier continued to operate the bar and lounge during the years 1976, 1977 and 1978. The Bank, as petitioners contend, had effective control over the Georgia Note and Georgia Mortgage from August 1974, when it was assigned to the Bank as part of petitioners' guaranty of the indebtedness of the Chandelier. However, in April of 1976, petitioners could have *508 reacquired title without out-of-pocket cost from the parties to whom the Georgia Property was sold in 1973. In 1977 the Bank agreed to withhold further action to collect on its judgment against petitioners provided the secured indebtedness to the Federal Land Bank of Columbia was brought into current status. It was not until May of 1977 that the Georgia Property was finally sold in foreclosure and purchased by the Bank, subject to the first lien held by the Federal Land Bank of Columbia. Thus, at the earliest, it was not until 1977 that the Georgia Note and Mortgage could be deemed to have become worthless to petitioners. [9] *509 While the value of this asset to petitioners may have been substantially less than $605,000 prior to 1977, no closed transaction prior to 1977 has been called to our attention. Neither have petitioners claimed a partially worthless debt deduction pursuant to section 1.166-3(a), Income Tax Regs., on any return before us. Similarly, we find nothing in the record to show that during any of the years before the Court petitioners' guaranty of the indebtedness of the Chandelier to the Bank had any tax consequences for petitioners. During this period, petitioners made no cash payments to the Bank. During 1975, as we have found, the Bank instituted an action in Dade County, Florida, against petitioners, among others, due to default on the repayment of the Chandelier loan. In March of 1976, a final judgment was entered against petitioners in the Bank's action. [10] *510 However, until petitioners made some payment to the Bank on their guaranty, either directly or through execution on the judgment, they were not subrogated to the Bank's rights as creditor against the Chandelier and consequently not until such payment would petitioners have any basis for claiming a bad debt deduction. See Sherman v. Commissioner,18 T.C. 746, 751-752 (1952). There is nothing in the record to indicate any payments on or collections by the Bank on the indebtedness (or on the judgment) until at the earliest, the year 1977. [11] For the foregoing reasons, on Issue I, we find for respondent. Issue II
In 1966 or 1967, Robertson commenced a joint venture in feeding and selling cattle with one Howard Pinder, another professional gambler, pursuant to which a silo and feedlots were constructed on land owned by Pinder, with funds provided by Robertson. The land on which the feedlots were situated and the silo, which had been constructed on Pinder's home place, were sold in 1973 to different purchasers. [12] The sale proceeds were divided between Robertson and Pinder. Respondent in the statutory notice determined that petitioners' interest in the land was 100/207 of the whole with the result that a gain of slightly over $70,000 was added to the income of petitioners for the year 1973. Respondent also determined that petitioners had a one-half interest in the silo with a cost basis of $13,000 and a net loss from the sale of the silo of $3,180.77. [13] Robertson testified that all of his records as to the money furnished to Pinder were lost. While respondent questions Robertson's credibility as a witness, we have no reason to disbelieve Robertson's statement *511 that he contributed between $60,000 and $70,000 to Pinder as his (Robertson's) share of the construction costs of the silo and feedlots. Some of these funds may also have been used to purchase cattle. The silo, fences and similar property would have been property used in a trade or business, subject to depreciation under section 167(a). According to Robertson's recollection, the silo was constructed in 1966 or 1967. Petitioners' cost basis would be reduced by six to seven years of depreciation, whether or not claimed on petitioners' tax returns. Since some of these funds were used for construction of the feedlots, to pay common labor and possibly to purchase cows, as well as to pay the cost of the silo, there is no possible way on this record to determine the original cost of the silo. There is not even in this record an explanation as to the basis upon which respondent concluded that the silo and related sewer cost $26,000. The burden of proof is upon petitioners to show that respondent's determination is incorrect. Rule 142 of the Rules of Practice and Procedure of this Court. We have no basis for applying Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). Petitioners have not *512 carried their burden of proof. We, therefore, find for respondent on this issue. Issues III and IV Respondent determined that petitioners realized unreported taxable income from the sale of certain "Treasure Island" lots (located in or on the border of Dade County, Florida) during the years 1974, 1975 and 1976, together with unreported interest income on the deferred portion of the sales prices. These income items aggregate $53,195.09. [14] Petitioners do not contest these income amounts but contend that the money was embezzled in the year 1976 as a result of which petitioners claim a loss deduction of $53,095.09 [15] (taking into account the $100 deductible specified in section 165(c) (now section 165(h)). Petitioners acquired this property in 1971, but we do not know when or by whom it was subdivided into one-acre lots. *513 Robertson made an arrangement with Mike Karpan for the latter to sell the lots from time to time, the first sale being closed in 1974. Karpan was to be compensated for his services by being allowed to retain one-half of the sale proceeds of each lot. As agreements were reached for the sale of the lots, the deeds were brought to Robertson for his signature and the transactions were then closed by Karpan. Karpan did not account to Robertson for the sale proceeds of any of the lots. Robertson did not demand his share of the sale proceeds since he knew that Karpan was in need of cash and thus used the sale proceeds. Finally in 1976 or 1977, Karpan disappeared. Clearly, such part of the sale proceeds as Robertson was entitled to retain was taxable income to him in the years the transactions were closed. Best v. Commissioner,26 B.T.A. 1070, 1076 (1932); Rossi v. Commissioner,41 B.T.A. 734, 738 (1940). The fact that the agent may never have accounted to the principal for the sale proceeds does not alter the fact that the *514 sales were consummated and petitioners' share of the proceeds, as well as interest on their share of the deferred installments, was taxable to petitioners. Croker v. Commissioner,27 B.T.A. 588, 590 (1933). Respondent has, however, taxed petitioners with the entire proceeds, whereas Robertson unequivocally testified that Karpan was entitled to retain one-half of the proceeds for his services. Respondent made no attempt to challenge this testimony. [16] Therefore, the income attributed by respondent to the "Treasure Island" lots shoudl be reduced by one-half in each of the three years. An embezzlement loss is inconsistent with the record. Robertson knew that the sales had been closed, that Karpan was keeping and using the sale proceeds and that was done with Robertson's implied, if not express, consent. See, e.g., Croker v. Commissioner,supra at 591. But since Karpan clearly had an obligation to account to Robertson for one-half of all the funds he collected from the sales, an indebtedness to that extent *515 would have been created under State law. It would appear that in the year in which Karpan disappeared, petitioners might claim a nonbusiness bad debt deduction. The statutory notice indicates that one of the sales was effected in 1974 and the balance in 1975, with substantial collections of purchase price and interest during the year 1976. Under these circumstances, we think it reasonable to suppose that Karpan did not disappear until after the end of 1976. Thus, petitioners' bad debt deduction should be claimed in a later year. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. Petitioners bear the burden of proving respondent's determination incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a)↩, Tex Court Rules of Practice and Procedure.
3. Although Robertson testified that he had not been in the gambling business since 1965, his 1977 Federal income tax return reported gambling income in a substantial amount and the parties stipulated that he was a professional gambler "at all times pertinent hereto."
4. Robertson testified that he had intended to borrow money from the Teamsters Union and was discouraged from doing it by reason of pending investigations of Teamsters Unions by the then Attorney General, Mr. Robert Kennedy. It is on this basis that we attribute the contemplated development to the early 1960's. ↩
5. The parties stipulated that in 1972 and 1973 petitioners owned two-thirds of the Georgia Property and the brother owned one-third. However, title was conveyed in 1958 to petitioners. There is no evidence of any conveyance by them to the brother and both petitioners and respondent, as well as the lessee-purchasers, have consistently treated petitioners as sole owners up to the 1973 sales.↩
6. Thus, the Georgia Mortgage was a second lien on the Georgia Property, subordinate to the $400,000 lien. ↩
7. If this ordinary loss treatment were sustained, it would result in a loss carryback to 1973 to offset the ordinary income which petitioners contend they realized on the 1973 sale.
8. See further discussion as to this property under Issues III and IV.↩
9. Since the Bank paid $1,000 for the property subject to the lien of the Federal Land Bank of Columbia, we assume this $1,000 was credited on petitioners' debt to the Bank and they should be deemed to have realized this sum out of the GeorgiaNote and Mortgage.
10. Apparently, a post-judgment motion was appealed by petitioners in 1979, but that has no bearing on matters before us. 11. See footnote 9, supra.↩
12. The silo was not moved and the purchaser apparently paid Pinder rent for use of Pinder's land. ↩
13. It appears that in the statutory notice petitioners' cost in the silo of $13,000 was taken into account both in computing petitioners' gain on the sale of the land and their loss on the silo itself. Respondent failed to raise this point, and it is now too late to do so.↩
14. Petitioners' brief uses the figures $53,185.09 and $53,085.09. The correct sums, based on the statutory notice, are those in the text. ↩
15. See footnote 14, supra.↩
16. It is beyond belief that Karpan was to be uncompensated. His retaining of the entire sale proceeds with Robertson's concurrence is entirely consistent with his right to a share.↩