THEO W. PINSON, III, and JOAN B. PINSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pinson v. Commissioner
Docket No. 31804-87
United States Tax Court
T.C. Memo 1990-234; 1990 Tax Ct. Memo LEXIS 241; 59 T.C.M. (CCH) 554; T.C.M. (RIA) 90234; May 14, 1990, Filed *241 Decision will be entered under Rule 155. Held: Petitioners are not entitled to a theft loss deduction for partnership income never reported as income or added to partnership interest basis. Held further: Petitioners are not entitled to a bad debt deduction for partnership income never reported as income or included in partnership interest basis. Held further: Petitioners are entitled to a capital loss, equal in amount to the value of the adjusted basis of a partnership interest upon liquidation. However, that loss is not related to partnership income never reported as income or included in partnership interest basis. Held further: Negligence additions to tax not sustained. Held further: Addition to tax for a substantial understatement of tax denied. Marc E. Grossberg and Christy M. Farrell, for the petitioners. Ana G. Cummings and David H. Peck, for the respondent. WHITAKER, Judge. WHITAKER
*787 MEMORANDUM FINDINGS OF FACT AND OPINION By statutory notice dated June 18, 1987, respondent determined a deficiency in petitioners' 1983 Federal income tax and additions to tax as follows: Additions to Tax
Section
Section
Section
Section
Deficiency
6621(d)[1]
6653(a)(1)
6653(a)(2)
6661
$ 51,473
*
$ 2,573.65
*
$ 12,868.25
*245 Resolution of some of the issues in this case involves consideration of the activities and assets of Carl Paschetag. Mr. Paschetag died in October 1987. Mr. Paschetag's widow, Cora Paschetag, testified at trial. On February 27, 1989, Mrs. Paschetag filed a Motion for Protective Order and Order Partially Sealing the Record and Transcript insofar as any portion of the record contained information on actions, activities, or conduct of Carl Paschetag which might pertain to petitioners' claim to a deduction under section 165. We granted that motion by order dated March 2, 1989, sealing the trial transcript, the Supplemental Stipulation of Facts, and attached exhibits. By order dated May 22, 1989, we ordered that the entire transcript remain sealed to avoid the cumbersome problem of unsealing portions of the transcript not covered by Mrs. Paschetag's motion. The order of May 22 also amended the order dated March 2, 1989, to seal four additional exhibits and was retroactive in effect to March 2, 1989. We have further amended the protective order, with the concurrence of Mrs. Paschetag's attorney, in order to make adequate findings of fact, but we have omitted from this opinion financial *246 information pertaining to Mr. and Mrs. Paschetag which is covered by our protective order. Such information is unnecessary in view of our disposition of this case. The notice of deficiency recites respondent's determination of increased interest on a substantial underpayment attributable to a tax-motivated transaction pursuant to section 6621(d). This section was amended and redesignated as section 6621(c) by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c)(1), 100 Stat. 2744. Respondent has conceded this addition. The issues remaining for decision are: (1) whether petitioners are entitled to a theft loss deduction with respect to partnership income never included in income or added to partnership interest basis; (2) in the alternative, whether petitioners are entitled to a bad debt loss or a capital loss with respect to that partnership income; (3) whether petitioners are liable for additions to tax for negligence pursuant to section 6653(a)(1) and (2); and (4) whether petitioners are liable for the addition to tax for a substantial understatement of income tax pursuant to section 6661. *788 FINDINGS OF FACT We resolved preliminary evidentiary and procedural matters *247 in Pinson v. Commissioner, T.C. Memo. 1990-77. The Findings of Fact set forth in that opinion are incorporated by this reference. Some facts are stipulated by the parties and are found accordingly. The stipulations of fact and corresponding exhibits are incorporated by this reference. Petitioners Theo and Joan Pinson are cash basis taxpayers who filed a joint Federal income tax return in 1983. At the time of filing their petition in this case, Mr. and Mrs. Pinson resided in Houston, Texas. Any reference to petitioner in the singular is to petitioner Theo W. Pinson III. Petitioner was a general partner in a law firm (the partnership) from the summer of 1981 until termination of the partnership in November 1983. Petitioner joined the partnership at the invitation of the managing partner, Carl Paschetag. At the time petitioner joined the partnership, Mr. Paschetag and Gwynne Old were partners. During petitioner's tenure, Bert Clardy, A. Ross Rommel, Jr., and Lawrence Gibbs also became partners. The partners had an oral partnership agreement which provided that each partner's distributive share of partnership income was to be computed by: (1) adding together *248 legal fees which were collected by the partnership and attributable to that partner's efforts and the efforts of associates under the supervision of that partner (the attributable collections); (2) subtracting that partner's share of partnership expenses; and (3) subtracting an amount equal to 5 percent of that partner's attributable collections to be paid as a management fee to Mr. Paschetag. Further, if a partner's draws exceeded his distributive share of partnership income, that partner was required to repay the excess to the partnership. At Mr. Paschetag's suggestion, the partnership established a line of credit with Texas Commerce Bank (TCB) to ensure that partnership expenses and partners' draws would be paid in the event that gross collections of the partnership were insufficient. Loans taken on the line of credit were secured by partnership accounts receivable. Payments on the loans were made out of the partnership's collections. All partners signed a continuing personal guarantee for the line of credit. The amount and distribution of partners' draws were controlled by Mr. Paschetag. Mr. Paschetag directed the preparation of the partnership's 1981 and 1982 returns and *249 Schedules K-1. Those returns reported distributable shares of partnership income to each partner based on the amount of that partner's annual draws rather than based on attributable collections as required by the partnership agreement. Mr. Paschetag kept the partnership's accounting records and wrote all checks for draws and other expenses of the partnership. In addition, Mr. Paschetag prepared bimonthly cash reports for distribution to the partners. The cash reports recounted billings attributable to each partner, running totals of partnership gross collections, running totals of collections attributable to each partner, running totals of each partner's draws, loan proceeds from and payments to TCB, and other expenses of the partnership. Mr. Paschetag arranged for loans from TCB to the partnership. Petitioner and the other partners left financial management of the partnership to Mr. Paschetag and depended upon the cash reports for financial information regarding the partnership. From July 1982 through December 1982 Mr. Paschetag did not distribute cash reports to the partners (the missing cash reports). Petitioner asked Mr. Paschetag's secretary, Rhonda Ochoa, for the missing *250 cash reports in both July 1982 and August 1982. Ms. Ochoa told petitioner that Mr. Paschetag had not yet finished compiling those reports. Petitioner renewed efforts to obtain the cash reports in December 1982. In January 1983 petitioner insisted upon delivery of the missing cash reports and Mr. Paschetag finally complied. Except for Mr. Rommel, petitioner and the other partners were unaware of the financial affairs of the partnership during the 6 months for which Mr. Paschetag did not distribute cash reports. Mr. Rommel, however, was aware of draws and billings of the partners for the last 6 months of 1982 because he took the partnership books from Rhonda Ochoa's files and perused them while working on weekends. Petitioner could have obtained access to the partnership books during that time as well. Petitioner, Mr. Clardy, Mr. Old, and Mr. Rommel met with Mr. Paschetag in January 1983. They demanded that Mr. Paschetag explain several items revealed in the missing cash reports. First, Mr. Paschetag's draws exceeded the sum of his share of partnership income plus the management fees due him from the other partners. By contrast, Mr. Paschetag distributed less than the amount *251 of their respective shares of partnership income in monthly draws to petitioner, Mr. Clardy, and Mr. Rommel. Gross collections attributable to petitioner for that year, after adjustment for payment of Mr. Paschetag's management fee, amounted to *789 $ 352,835.71. Mr. Paschetag distributed $ 124,000 in draws to petitioner in 1982. [2]
Second, the partnership was in poor financial condition despite considerable gross collections. Total partnership gross collections for 1982 were $ 1,146,687.40. Partnership expenses totalled $ 677,842.26, leaving $ 468,845.14 available for draws of the partners. Total *252 draws of all partners for 1982, however, amounted to $ 582,529.20. Mr. Paschetag increased the amount of draws distributed monthly to himself, Mr. Clardy, Mr. Old, and petitioner during the latter half of 1982. Mr. Paschetag's monthly draws increased by $ 8,000 per month and petitioner's monthly draws increased by $ 2,000. Petitioner's increased draws still did not effect distribution to him of his share of partnership income. Mr. Paschetag's increased draws enlarged the amount by which his total draws exceeded his share of partnership income. At the same time, Mr. Paschetag decreased the amount of time he spent working in the office and frequently consumed alcohol during working hours. Further, the missing cash reports showed that, without informing the other partners, Mr. Paschetag obligated the partnership on three loans from TCB between November 1982 and January 15, 1983. Those three loans from TCB totaled $ 165,000. Mr. Paschetag did not have specific authority to incur such liability on behalf of the partnership. Notwithstanding the loans from TCB, however, the partnership checking account was often overdrawn and incurred frequent nonsufficient funds penalties during *253 the last 6 months of 1982. The partnership was behind in payments to creditors, including the telephone company and its landlord. The loan proceeds were apparently used primarily to support partners' draws. According to the terms of the partnership agreement, Mr. Paschetag was obligated to repay the partnership for the amount by which his draws exceeded his share of partnership income. However, Mr. Paschetag refused to acknowledge to the partners that he had an obligation to repay the partnership for his excess draws or that such draws were in any way improper. Mr. Paschetag initially told the partners that his excess draws were based on an error in calculating his share of partnership income. He subsequently claimed the draws were correct and justified either because he brought in new clients or because the 5-percent management fees should have been higher. However, Mr. Paschetag brought few new clients to the partnership during 1982. The partners voted to dissolve the partnership in March 1983 because of Mr. Paschetag's refusal to agree to repay excess draws and to change his methods of managing the partnership. The partners, except for Mr. Paschetag, appointed petitioner *254 as their agent to wind up partnership business. Petitioner hired Joseph Dooling, a certified public accountant, to audit the partnership books, to determine each partner's capital account, to investigate and determine the exact terms of the oral partnership agreement, and to prepare the 1983 partnership return on the basis of those terms. Mr. Dooling determined the terms of the partnership agreement through reports from the partners of their understanding of the terms of the agreement and of their intent at the time of entering into the agreement. Mr. Paschetag did not cooperate with Mr. Dooling in determining the terms of the partnership agreement. The partnership was unable to pay the outstanding debt on the last three TCB loans arranged by Mr. Paschetag. The partners assumed the partnership's liability to TCB upon termination of the partnership in November 1983. As his share of the TCB debt, petitioner paid TCB $ 15,124.65. Mr Paschetag also assumed a portion of the partnership's liability to TCB. The partnership had no assets other than uncollected accounts receivable to distribute to the partners upon termination. Mr. Dooling advised preparation of the 1983 partnership *255 return in a manner consistent with the partnership returns for 1981 and 1982, even though those returns incorrectly reported distributive shares of partnership income based upon annual draws. Instead, petitioner directed that the return reflect the partners' proper distributive shares for 1983, as determined by the terms of the partnership agreement. Computed under the terms of the partnership agreement, petitioner's share of partnership income for 1983, reflecting partnership collections attributable to him less attributable expenses, was $ 129,779.22. Petitioner's total draws for 1983 amounted to $ 12,000. The parties stipulate that petitioner's adjusted partnership interest basis upon liquidation of his interest and termination of the partnership was $ 100,312.65. That adjusted basis was computed by (1) increasing basis for petitioner's distributable share of net partnership income, as reported on the Schedules K-1 of the partnership returns, for the years 1981, 1982, *790 and 1983; (2) decreasing basis for the amount of petitioner's draws in those years, and (3) increasing basis for the amount of the partnership's liability to TCB which petitioner assumed at termination of the *256 partnership. The partnership returns for 1981 and 1982 incorrectly reported shares of partnership income as determined by a partner's annual draws. Therefore, the increases to basis for petitioner's share of partnership income and the decreases to basis for petitioner's draws in those years were, in essence, a wash. Petitioner neither included in income nor increased the basis in his partnership interest by that amount of partnership income for 1981 and 1982 to which petitioner was entitled under the terms of the partnership agreement, but which was not actually distributed to him in the form of draws. After accounting for attributable expenses, petitioner's capital account at the end of 1982 showed a negative basis of $ 32,591.22. Starting from that figure, petitioner's adjusted partnership interest basis upon liquidation of $ 100,312.65 was reached by increasing basis by petitioner's reported share of partnership income for 1983, i.e., $ 129,779.22, decreasing basis by his draws of $ 12,000 for that year, and increasing basis by the $ 15,124.65 TCB liability assumed. Sometime between March 1983 and November 1983 Mr. Dooling told petitioner that petitioner had received approximately *257 $ 170,000 less in partnership income during 1982 than he should have received. Mr. Dooling advised petitioner that, in Mr. Dooling's opinion, Mr. Paschetag had embezzled or stolen such an amount from the partnership since Mr. Paschetag had sole control of the amount and distribution of partners' draws. [3] At that point, petitioner began investigation of Mr. Paschetag's financial condition. In January 1983 Mr. Paschetag directed preparation of a personal financial statement dated February 1983. The financial statement did not present a true picture of Mr. Paschetag's financial condition in 1983. Prior to filing his 1983 joint Federal income tax return in October 1984, petitioner was aware of the financial statement *258 and its contents, but discounted the financial statement because of discrepancies and incompleteness. The financial statement showed Mr. Paschetag as having substantial net worth and listed him as owner of unidentified real property. The financial statement underestimated the 1983 value of Mr. Paschetag's real property. The financial statement also indicated outstanding mortgages on real property of substantial aggregate face values, without identifying a specific piece of real property in connection with any particular mortgage. In addition, Mr. Paschetag had significant other indebtedness, some of which was not disclosed on the financial statement. Although not separately identified on the financial statement, Mr. Paschetag owned at least three pieces of real property during 1983. Those properties included Mr. Paschetag's primary residence in Houston, Texas, a second residence (the bayhouse), and a country home in Washington County, Texas (the farm). During 1983, petitioner saw a letter which Gibraltar Savings sent to Mr. Paschetag at the partnership's office address. That letter threatened foreclosure on Gibraltar's mortgage on Mr. Paschetag's farm. However, there is no *259 evidence that Gibraltar Savings ever instituted foreclosure proceedings. Petitioner also knew that as of 1983 it was unlikely that he could reach Mr. Paschetag's homestead (primary residence) in satisfaction of a judgment against Mr. Paschetag. [4]
The *260 financial statement overestimated Mr. Paschetag's income for 1983 significantly. In addition, Mr. Paschetag had revealed to petitioner that stocks and securities which he owned secured various loans to Mr. Paschetag. The financial statement did not mention that securities listed by Mr. Paschetag as assets were also collateral on any loan. Through discussion with other attorneys, petitioner was aware that Mr. Paschetag became the managing partner of another law firm immediately after dissolution of the partnership in which petitioner was a partner. That partnership differed from the partnership in issue only in that a written partnership agreement existed. That partnership dissolved in August or September 1983, because of a dispute over the amount of Mr. Paschetag's draws. Mr. Paschetag was sued in 1983 for breach of the term of the written partnership agreement calling for repayment of excess draws. Petitioner was aware of *791 this suit against Mr. Paschetag at the time the suit was filed. The suit was settled in April 1985, for a $ 70,000 promissory note issued by Mrs. Paschetag under power of attorney for Mr. Paschetag. The note was secured by a secondary deed of trust on the *261 Washington County farm. Petitioner determined that he had little hope of recovering from Mr. Paschetag in 1983 that portion of his share of partnership income not previously received in the form of draws. However, petitioner contacted an attorney during 1983 specifically to discuss commencement of civil litigation against Mr. Paschetag. After minimal progress, petitioner switched attorneys in 1984. Petitioner thereafter joined Bert Clardy in filing suit against Mr. Paschetag in March 1984 alleging breach of fiduciary duty and breach of the term of the partnership agreement requiring repayment of excess draws. In conjunction with the civil litigation, petitioner and Mr. Clardy filed notices of lis pendens in the proper county recorders' offices upon Mr. Paschetag's home, bayhouse, and farm property. The lis pendens limited the marketability of those properties but did not have the effect of liens upon the properties. [5]
*262 In preparation for filing his 1983 joint Federal income tax return, petitioner asked Mr. Dooling to provide John E. McDonald, petitioner's personal accountant, with a figure for the amount of partnership income allegedly embezzled from petitioner by Mr. Paschetag. Petitioner consulted briefly with Mr. McDonald and with Robert White, a tax attorney, before directing Mr. McDonald to prepare petitioners' joint return to include a theft loss deduction of $ 129,779.22. The amount of that claimed deduction equals the amount petitioner reported as his share of partnership income for 1983. Neither Mr. Dooling, Mr. McDonald, nor Mr. White advised petitioner to claim a theft loss deduction in 1983. Petitioner's suit against Mr. Paschetag was eventually settled in 1985 by Mrs. Paschetag for $ 95,000 and release of the three notices of lis pendens. Petitioner's share of the settlement was $ 66,788.06, which he reported as income in 1985. Neither petitioner nor any other partner ever instituted criminal proceedings against Mr. Paschetag. OPINION 1. Loss Deduction
Petitioners contend that instead of distributing as draws all partnership income due petitioner under the partnership *263 agreement, Mr. Paschetag funded excess draws to himself with a portion of petitioner's 1982 partnership income. Petitioners further assert that Mr. Paschetag's unauthorized negotiation of loans to the partnership from TCB funded further excess draws, depleted partnership funds to the extent that there was no money available for distribution to the partners upon termination, and forced petitioner personally to assume partnership debt. Petitioners argue that Mr. Paschetag's conduct amounted to theft under Texas law and for Federal income tax purposes. Further, petitioners maintain that they had no reasonable prospect of recovery from Mr. Paschetag in 1983, the year the alleged loss was discovered, and are therefore entitled to a theft loss deduction in that year. Alternatively, petitioners claim they sustained a bad debt loss by virtue of Mr. Paschetag's excess draws. Respondent argues that Mr. Paschetag's conduct did not constitute theft under Texas law, and therefore did not constitute theft for Federal tax purposes. Further, respondent maintains that even if theft had occurred, petitioners had a reasonable prospect of recovery from Mr. Paschetag in 1983 which defeats entitlement *264 to a deduction in that year. Respondent additionally asserts that petitioners are entitled to neither a bad debt deduction nor a capital loss deduction. We agree that petitioner is not entitled to a theft loss or a bad debt deduction. The parties extensively argued and briefed the issues. In particular, a large portion of the trial in this case focused upon the questions of whether Mr. Paschetag had criminal intent to deprive petitioner of partnership income and whether the value of Mr. Paschetag's assets in 1983 was such that petitioners had a possibility of recovery in that year. However, we find that questions of whether a theft occurred and whether a reasonable possibility of recovery existed are premature under the circumstances of this case. Where, as here, we must decide whether a cash basis taxpayer is entitled to a theft loss deduction for allegedly embezzled income, the answer depends upon whether the taxpayer reported the allegedly embezzled funds and paid tax on them. If the taxpayer has not, no sophisticated analysis is necessary to reach the conclusion that no deduction *265 is allowed. Thus, we need not reach the issue of whether Mr. Paschetag's conduct amounted to theft for tax purposes. Assuming arguendo that Mr. Paschetag's conduct did amount to theft, we would nevertheless uphold respondent's determination that petitioners may not claim a theft loss deduction in 1983. Taxpayers may not deduct the loss of income which is stolen before actually *792 being received and which is never reported as income. United States v. Kleifgen, 557 F.2d 1293, 1299 (9th Cir. 1977); Alsop v. Commissioner, 290 F.2d 726, 729 (2d Cir. 1961), affg. 34 T.C. 606 (1960). Because of the manner in which Mr. Paschetag directed preparation of the partnership returns and Schedules K-1 for 1981 and 1982, petitioner's distributable share of partnership income for those years was incorrectly based upon the amount of his annual draws for those years. Petitioners did not include in income that portion of petitioner's share of partnership income which was never distributed as draws and for which they claimed a theft loss deduction. For the *266 years 1981 and 1982, petitioner's partnership interest basis increased by his share of partnership income as reported on the partnership returns for those years and decreased in a substantially like amount corresponding to distributions in the form of draws. Petitioner did not include in basis that portion of his share of partnership income for 1981 and 1982 which he did not receive as draws. Therefore, to permit a theft loss deduction would give petitioners a double tax benefit. Petitioners would be relieved from paying tax on that portion of petitioner's share of partnership income which exceeded petitioner's draws for 1981 and 1982, and also subsequently relieved from paying tax in 1983 on that amount of income which would be offset by a theft loss deduction. See United States v. Kleifqen, supra at 1299; Reno Turf Club, Inc. v. Commissioner, T.C. Memo. 1979-381. Since our decision on this issue is determinative, we need not decide whether petitioner sustained a loss due to theft or whether petitioner had a possibility of recovery from Mr. Paschetag in 1983. Similarly, petitioners are not entitled to a bad debt deduction based upon partnership *267 income never included in income or added to basis. Again, we need not decide whether Mr. Paschetag owed petitioners a debt which became wholly or partially worthless in 1983. Even assuming such was the case, we may not allow a bad debt deduction for worthless debts arising from unpaid wages or other income items unless that income has been included in the return of income for the year in which the deduction is claimed or for a prior taxable year. Sec. 1.166-1(e), Income Tax Regs.; Gertz v Commissioner, 64 T.C. 598 (1975); Kopunek v. Commissioner, T.C. Memo. 1987-417. Petitioners never included in income unpaid partnership income from the years 1981 and 1982 and are not entitled to a bad debt deduction. However, petitioners are entitled to a loss deduction in 1983 pursuant to section 731(a). Section 731(a)(2) provides for loss recognition in the case of liquidation of a partnership interest where no property other than money, unrealized *268 receivables (as defined in section 751(c)), or inventory (as described in section 751(d)(2)) is distributed. The amount of such loss is measured by the difference between the adjusted basis of a partner's partnership interest upon liquidation and the sum of any money distributed and the adjusted basis to that partner in uncollected receivables or inventory distributed in liquidation. Sec. 731(a)(2). The aggregate basis of property received in a liquidating distribution is equal to the partner's adjusted basis in the partnership interest less cash received in the distribution. Sec. 732(b). Under the circumstances of this case, loss recognized upon liquidation of petitioner's partnership interest is considered loss from the sale or exchange of a partnership interest, and as such is a capital loss. Secs. 731(a) and 741. The partnership had no assets other than uncollected accounts receivable to distribute upon termination and liquidation of petitioner's partnership interest. The partnership, a cash basis taxpayer, had a zero basis in uncollected accounts receivable. Pursuant to section 732(b), the adjusted basis of any uncollected receivables distributed to petitioner was therefore *269 zero. Thus, the adjusted basis of petitioner's partnership interest upon liquidation is not affected by the distribution of uncollected receivables. We found that petitioner's adjusted partnership interest basis, properly computed under section 705, was $ 100,312.65 upon liquidation. Computation of that adjusted basis included increases for petitioner's share of partnership income as reported on the partnership returns Schedules K-1 during the existence of the partnership, an increase for TCB liability assumed by petitioner, and decreases for distributions to petitioner in the form of draws. Sec. 705(a)(1) and (2). As noted above, those portions of petitioner's partnership income not distributed to him as draws in 1981 and 1982 were not added into the computation of partnership interest basis. Therefore, the capital loss to which petitioner is entitled is unrelated to any partnership income which petitioner did not receive in the form of draws in 1981 and 1982. The facts in the present case are essentially the same as the facts in Revenue Ruling 76-189, 1976-1 C.B. 181. *270 Where there are no assets to distribute upon termination of the partnership, a partner may claim a capital loss in the amount of that partner's adjusted partnership interest basis as determined at the concurrent liquidation of his partnership interest. Sec. 731(a)(2). The distribution to petitioner of uncollected accounts receivable does not affect *793 entitlement to a capital loss as petitioner must include any collections as ordinary income at the time of collection. Therefore, petitioner is entitled to a capital loss in the amount of $ 100,312.65 in 1983. 2. Negligence Additions to Tax
Respondent determined additions to tax under section 6653(a)(1) and (2). Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of any underpayment of tax is due to negligence or disregard of rules and regulations. Section 6653(a)(2) provides for an addition to tax in an amount equal to 50 percent of the interest payable under section 6601 with respect to that portion of such underpayment attributable to negligence. Negligence is a lack of due care or failure *271 to do what a reasonable and ordinarily prudent person would do under the circumstances. Rybak v. Commissioner, 91 T.C. 524, 565 (1988); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination that the underpayment was due to negligence is presumptively correct, and petitioners bear the burden of proving otherwise by a preponderance of the evidence. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982). Petitioners argue that the negligence additions should not be sustained because they relied in good faith upon the advice of Mr. Dooling, Mr. White, and Mr. McDonald, competent professionals to whom they had provided all information necessary, in directing Mr. McDonald to prepare their return. As a general rule, the duty of filing accurate returns cannot be avoided by placing reliance on an agent preparing the return. Pritchett v. Commissioner, 63 T.C. 149, 174 (1974); Enoch v. Commissioner, 57 T.C. 781, 802 (1972). Petitioners claim the benefit of the exception from the *272 general rule. The exception provides that petitioners might be immunized from negligence additions upon a showing that competent professionals advised them to claim a theft loss deduction, and that such advice was independent and based upon full knowledge of the circumstances in issue. Leonhart v. Commissioner, 414 F.2d 749, 750 (4th Cir. 1969), affg. T.C. Memo. 1968-98; see also Snyder v. Commissioner, T.C. Memo. 1983-692, affd. by order (4th Cir., Nov. 25, 1985). We find this exception to be applicable here. Petitioner was advised that Mr. Paschetag's conduct amounted to embezzlement and petitioner relied on that advice in claiming a theft loss deduction. Petitioners are not liable for the negligence addition to tax. 3. Addition to Tax For Substantial Understatement of Income
Section 6661 imposes an addition to tax if there is a substantial understatement of income tax for a taxable year. The amount of such additions assessed after October 21, 1986, is equal to 25 percent of the amount of any underpayment attributable to *273 such understatement. Sec. 6661(a); Pallottini v. Commissioner, 90 T.C. 498 (1988). A substantial understatement is one which exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b). If petitioners' understatement of income is substantial within the meaning of section 6661(b), they are liable for the section 6661 addition unless such understatement can be reduced by section 6661(b)(2)(B). Petitioners claimed an ordinary loss of $ 129,779.22 and were instead entitled to a capital loss of $ 100,312.65. We hold that whether or not the resulting underpayment is "substantial," that understatement is reduced according to section 6661(b)(2)(B). Section 6661(b)(2)(B) provides for the reduction of an understatement by that portion of the understatement for which the taxpayer shows substantial authority for the position or for which the taxpayer disclosed facts relevant to the position on the return or in a statement attached to the return. There is substantial authority for the tax treatment of an item only if the weight of *274 the authorities supporting that tax treatment outweighs the authorities supporting the contrary position. Sec. 1.6661-3(b)(1), Income Tax Regs. In the present case, petitioner presented no authority which supported a deduction for loss of unpaid partnership income which had never been included in income. However, section 6661(b)(2)(B) is phrased in the disjunctive. A section 6661 addition may also be reduced by that portion of the understatement attributable to items other than tax shelter items where the relevant facts affecting the items' tax treatment is adequately disclosed on the return or on a statement attached to the return. Sec. 1.6661-4(a), Income Tax Regs. An attached statement constitutes adequate disclosure if it includes a caption identifying it *794 as a section 6661 disclosure, identification and amount of the item being disclosed, and the facts affecting the tax treatment of the item which may reasonably be expected to apprise respondent of the potential controversy concerning such tax treatment. Sec. 1.6661-4(b)(1), Income Tax Regs.
*275 Petitioners disclosed the facts underlying their claimed loss deduction on a statement attached to their 1983 return. That statement did not include a caption identifying the statement as a section 6661 disclosure. However, the requirements of adequate disclosure are nonetheless-met if sufficient information is provided to respondent to identify the potential controversy involved. See Schirmer v. Commissioner, 89 T.C. 277, 285-286 (1987) (citing S. Rept. 97-494 at 274 (1982)). Petitioners not only described the facts leading up to their claim of a theft loss, they also attached several other documents outlining their legal position and their pursuit of civil recourse against Mr. Paschetag for misappropriation of partnership funds. Therefore, respondent was easily able to identify the potential controversy involved. Petitioners made adequate disclosure of the tax treatment which they utilized and which led to their underpayment. Accordingly, petitioners are not liable for the substantial underpayment addition. For the foregoing reasons, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50% of the interest due on the underpayment.↩
2. We are unable to determine from the record before us the exact amount of expenses attributable to petitioner in 1982. We are satisfied that the amount of draws received by petitioner in that year did not reflect his correct share of partnership income. In light of our decision below, we need not make a finding on the precise amount of partnership income to which petitioner was entitled but did not receive in 1982.↩
3. In addition to Mr. Paschetag's excess draws, Lawrence Gibbs had excess draws of $ 64,633.29 and Gwynne Old had overdraws of $ 55,457.57. Mr. Dooling attributed Mr. Gibbs' overdraws to legitimate expenses Mr. Gibbs incurred while starting up a satellite office in San Antonio, Texas, during 1982.↩
4. As of 1983, Texas courts had allowed homesteads to be reached for satisfaction of judgment liens, but only where stolen or misappropriated funds were used to purchase or improve that homestead. The situation in the present case, that of the ability to impose a lien on a pre-existing homestead, was later settled in Curtis Sharp Custom Homes, Inc. v. Glover, 701 S.W.2d 24, 28 (Tex. Ct. App. 1985). The court in that case held that Article 16, section 50, of the Texas Constitution↩ prohibits imposition of a lien upon a homestead to secure recovery of embezzled funds or to satisfy debts other than those created for purchase or improvement of a homestead.
5. A notice of lis pendens puts a prospective buyer on notice that an adverse party has brought suit against the owner of real property, claiming an interest in the property. In Texas, a notice of lis pendens may be cancelled through payment of a judgment affecting the property or through posting of a bond. Tex. Rev. Civ. Stat. Ann. art. 6643(a)↩ (Vernon 1989).