T.C. Memo. 2014-174

UNITED STATES TAX COURT

HECTOR SANCHEZ, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9729-12.                         Filed August 28, 2014.

<u>William E. Taggart, Jr.</u>, and <u>Jason J. Galek</u>, for petitioner.

<u>Michael Skeen</u>, <u>Randall G. Durfee</u>, and <u>Sara E. Sexton</u>, for respondent.

[*2]         MEMORANDUM FINDINGS OF FACT AND OPINION[1]

LARO, <u>Judge</u>:  The sole issue before the Court is whether petitioner is liable for a fraud penalty under section 6663[2] for 2005, 2006, 2007, and 2008 (years at issue).  Petitioner resided in California when he filed his petition.

## FINDINGS OF FACT[3]

Petitioner is a citizen of Mexico and attended primary school there through the third grade.  Approximately 40 years ago petitioner came to the United States, and he was a resident alien of the United States during the years at issue.  Petitioner speaks English but not fluently.

---

[1]This case was tried before Judge Diane L. Kroupa in March 2014.  On June 16, 2014, Judge Kroupa retired from the Tax Court.  On June 18, 2014, the Court issued an order informing the parties of Judge Kroupa's retirement and proposing to reassign this case to another judicial officer of the Court for purposes of preparing the opinion and entering the decision based on the record of trial, or, alternatively, allowing the parties to request a new trial.  On July 10, 2014, the parties filed a joint response consenting to the reassignment of this case.  On July 23, 2014, the Court issued an order assigning this case to Judge David Laro.

[2]Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years at issue, and Rule references are to the Tax Court Rules of Practice and Procedure.  Some dollar amounts in tables have been rounded.

[3]Because of the reassignment of this case for purposes of preparing the opinion and entering the decision, we did not have an opportunity to observe the demeanor of the witnesses.  We therefore make no inferences of credibility, except that which may be judged from the written record.

**[*3]** I.  <u>Cash for Cans</u>

Around 20 years ago petitioner started a sole proprietorship called Cash for Cans. Cash for Cans pays individuals for recyclable material, aggregates these materials, and sells them to processors at a premium. California sets a cash redemption value (CRV) for various recyclable materials such as aluminum, glass, and certain plastics, including but not limited to polyethylene terephthalate (PET) and high-density polyethylene (HDPE). In California retailers must collect the CRV from consumers as a deposit when they sell products with recyclable packaging. Consumers may then redeem the CRV by returning the recyclable material to a recycler (such as Cash for Cans), which is required by law to pay the consumer at least the CRV.

The State of California requires recyclers to keep daily logs. For each transaction the daily log shows the type and weight of material received, the amount paid, and the customer's name and signature. In addition, the State of California requires recyclers to complete shipping reports. The shipping report contains the shipment date, the shipper's information, the receiver's information, the type and weight of material delivered, and the CRV refund amount. State of California auditors inspect the business premises of recyclers to ensure that they purchase only materials that are part of the California redemption program and to

[*4] ensure that they maintain the required records. Auditors can issue a citation to the recycler if it is not in compliance with California law. State auditors visited Cash for Cans on several occasions during the years at issue.

Cash for Cans maintained daily logs during each of the years at issue. Every day, three or four employees ran Cash for Cans' recycling operations. Customers would bring recyclable materials to Cash for Cans, and an employee would verify that the materials were California redemption materials before sorting them into baskets. The materials were then weighed and the customer given a handwritten ticket for the amount due to him. For each year at issue, petitioner paid his customers the minimum CRV rate set by the State.

For each transaction a Cash for Cans employee would also fill out an entry on the daily log, which the customer was required to sign. The customer then redeemed the handwritten ticket for cash at a window, which was generally attended by petitioner or a member of his family. At the end of each day the daily logs were tallied to calculate the total amount of each material purchased and the total amount paid. Cash for Cans maintained these daily logs in its office. Petitioner's daughter, Rocio Sanchez, created monthly summaries from these daily logs. At the end of the year, Rocio Sanchez used these monthly summaries to

**[*5]** generate a spreadsheet which listed (in pounds) the total amount of each material that Cash for Cans had purchased every month (materials summary).

Cash for Cans did business primarily with three processors during the years at issue: Anheuser-Busch Recycling Co. (Anheuser-Busch), for aluminum and plastic; Western Strategic Material, Inc. (Western Strategic), for glass; and Alco Iron & Metal Co. (Alco), for scrap materials. Cash for Cans delivered the recyclable materials to the respective processors by truck. For each truckload of material, a shipping report was completed. On each shipping report, the processor recorded the weight of recyclable materials delivered and the total payment amount (which includes the CRV refund amount and a premium). Cash for Cans retained a copy of the shipping report for its records. All three processors paid Cash for Cans exclusively by check. Petitioner was responsible for depositing these checks and for maintaining sufficient cash on Cash for Cans' premises to pay customers.

Petitioner gave Rocio Sanchez the responsibility for tracking Cash for Cans' expenses. Rocio Sanchez entered all of Cash for Cans' expenses into a computer accounting program called QuickBooks and used QuickBooks' profit and loss statement function to generate annual expense summaries. Rocio Sanchez did not track Cash for Cans' income, nor was she aware of whether anyone else did.

**[*6]** Petitioner did not pay Rocio Sanchez for her services but did help pay for her living expenses in 2006 and 2007.

II.     City of Oakland Business Tax Declaration

Petitioner visited the City of Oakland offices to prepare and file a business tax declaration during each of the years at issue.  The business tax declaration is an annual renewal form that businesses are required to file in order to maintain their City of Oakland business licenses.  Acton Hodgson is a tax representative for the City of Oakland.  He was assigned to assist petitioner in completing his business tax declaration for each of the years at issue because he was the sole Spanish speaker in that office.  The City of Oakland taxes business on the basis of a certain percentage of their gross receipts for the previous year.  For example, the 2008 and 2009 renewal tax rate was $1.20 per $1,000 of gross receipts for the prior year.  Taxpayers are not required to provide supporting documentation to substantiate their gross receipts, and the City does not verify the accuracy of the reported information.  Therefore, Mr. Hodgson took the gross receipts reported by petitioner at "face value".  According to Mr. Hodgson, petitioner calculated his annual gross receipts using the materials summaries.  These materials summaries provided the total weight of the various materials recycled by Cash for Cans and

[*7] the rate per pound for each material.  For example, Cash for Cans' 2007 materials summary discloses:

| 2007 | Aluminum | Glass | PET #1 | PET #2 |
|---|---|---|---|---|
| Total weight (lbs.) | 429,049 | 2,799,455 | 755,172 | 96,907 |
| Rate (per lb.) | $0.39 | $0.305 | $0.15 | $0.8 |

Therefore, on the basis of the weights and rates set forth in its 2007 materials summary, Cash for Cans' gross receipts should have been $1,211,964.29. Petitioner, however, reported 2007 gross receipts of only $398,467 on his 2008 business tax declaration.

As another example, Cash for Cans' 2008 materials summary discloses:

| 2008 | Aluminum | Glass | Plastic | HDPE |
|---|---|---|---|---|
| Total weight (lbs.) | 423,605 | 2,596,335 | 806,565 | 65,333 |
| Rate (per lb.) | | | | |
| Jan.-June | $1.56 | $0.105 | $0.90 | $0.52 |
| July-Dec. | 1.57 | 0.105 | 0.92 | 0.54 |
| Total | 663,062 | 272,615 | 734,809 | 34,635 |

Therefore, on the basis of its 2008 materials summary, Cash for Cans' gross receipts equaled $1,705,121.  Petitioner, however, reported 2008 gross receipts of only $284,279 on his 2009 business tax declaration.  For each of the years at issue,

[*8] petitioner filed his City of Oakland business tax declaration before filing his Federal income tax return.

III.    Federal Income Tax Returns

Griselda Robles is the owner of Griselda's Tax and Bookkeeping Services.[4] Ms. Robles prepared petitioner's Federal income tax returns and his employment tax returns for the years at issue. She did not perform any bookkeeping, general accounting, or auditing services for petitioner.

Each year petitioner and Rocio Sanchez provided Ms. Robles with Cash for Cans' materials summary, expense summary, and City of Oakland business tax declaration. Petitioner did not provide Ms. Robles with Cash for Cans' books and records or its bank account statements. Instead, petitioner told Ms. Robles the figures to report as Cash for Cans' gross receipts and cost of goods sold (COGS). Ms. Robles noticed that the gross receipts she calculated using the materials summaries did not reconcile with the amounts reported on the City of Oakland business tax declarations. When she brought these discrepancies to petitioner's attention, however, he instructed her to use the amounts reported on the City of Oakland business tax declarations. After completing petitioner's return for each

_____

[4]Ms. Robles did not complete college and is not a certified public accountant (C.P.A.).

[*9] of the years at issue, Ms. Robles met with petitioner to discuss the completed return for that year. Ms. Robles always communicated with petitioner in Spanish.

## IV. IRS Audit

IRS Revenue Agent Bally Chiu (RA Chiu) was assigned to audit petitioner's tax returns for the years at issue. During the audit RA Chiu examined petitioner's bank statements and noticed that the deposits were greater than she would have expected according to Cash for Cans' reported revenue.

### A. Interviews

RA Chiu met with petitioner twice in connection with the audit. Ms. Robles represented petitioner during the first meeting. The first meeting was an informal interview that took place in April 2010 at Ms. Robles' office. Petitioner also gave RA Chiu a tour of Cash for Cans during this first interview. After the first interview Ms. Robles provided RA Chiu with Cash for Cans' materials summaries for 2007 and 2008, some expense summaries, and some bank statements.

Petitioner, however, did not agree to a second interview. As a result, RA Chiu had to summon petitioner to appear and present testimony and records. The summons interview took place on September 30, 2010. The interview was attended by RA Chiu, IRS attorney Jon Feldhammer, IRS manager Carlos Aguilar, petitioner, petitioner's counsel William Taggart, and two interpreters. Petitioner

[*10] did not bring to the interview the records that respondent had requested in the summons.

During the interview petitioner initially represented that he had only three U.S. bank accounts with Bank of America--personal, payroll, and business--and that he did not have any foreign bank accounts or any other foreign assets. Further questioning revealed, however, that petitioner's wife (Rosalia Felis Camacho) lived in Mexico and that petitioner routinely wired her money to support her and her four children from a prior marriage. In addition, petitioner admitted that he had wired approximately $130,000 to his wife in Mexico for the purchase of a house. Finally, petitioner admitted that he had opened a bank account in Mexico when he visited but represented that he wired only $500 to $1,000 to that account and that he closed the account when he returned to the United States.

Regarding his tax returns, petitioner admitted that he provided Ms. Robles with income information and that Rocio Sanchez provided Ms. Robles with expense information. When asked how he determined his gross receipts, petitioner replied that he "just figured it out". Petitioner admitted, however, that Anheuser-Busch and Western Strategic kept records of all payments made to him and that they could provide such records upon request. Petitioner further admitted that he had requested and received these records in the past. Finally, at one point,

[*11] petitioner asked for clarification of whether a question pertained to net or gross income, thus demonstrating an understanding of these concepts.

### B.    Records

After the summons interview petitioner produced the bank records requested in respondent's summons.  Petitioner did not, however, provide all of the documentation that RA Chiu had requested.  Therefore, RA Chiu obtained records of Cash for Cans' activities directly from Anheuser-Busch and Western Strategic.  RA Chiu also subpoenaed Bank of America for information regarding petitioner's home loan.[5]

RA Chiu used the records from Anheuser-Busch and Western Strategic to reconstruct Cash for Cans' gross receipts from those two companies and used petitioner's bank records to reconstruct Cash for Cans' gross receipts from Alco. Pursuant to her analysis, RA Chiu calculated and adjusted Cash for Cans' gross receipts as follows:

---

[5]Petitioner owned and resided at 6253 Bromley Ave., Oakland, California, a four-bedroom two-bathroom house with a two-bedroom one-bathroom back unit, during the years at issue.  In 2008 petitioner rented out a portion of the house for $980 a month and the back unit for $550 a month.  Each month, petitioner made over $2,000 in mortgage payments on the house.

| [*12] Gross receipts | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|
| Aluminum | $914,043 | $924,241 | $1,025,004 | $1,003,921 |
| Plastics | 753,534 | 736,561 | 930,063 | 992,925 |
| Glass | 385,548 | 376,706 | 450,485 | 451,772 |
| Scrap | 14,123 | -0- | 14,038 | 34,554 |
| Total | 2,067,247 | 2,037,508 | 2,419,590 | 2,483,173 |
| Total per return | 248,704 | 363,966 | 398,467 | 541,083 |
| Adjustment | 1,818,543 | 1,673,542 | 2,021,123 | 1,942,090 |

Next, RA Chiu used the materials summaries for 2007 and 2008 to calculate Cash for Cans' COGS. RA Chiu did not have Cash for Cans' materials summaries for 2005 and 2006. Therefore, RA Chiu calculated Cash for Cans' aluminum and plastic COGS from the records Anheuser-Busch provided. Western Strategic's records, however, did not include similar information for glass, so RA Chiu used the average cost of glass from 2007 to 2008 to estimate COGS for glass in 2005 and 2006. Pursuant to her analysis, RA Chiu calculated and adjusted Cash for Cans' COGS as follows:

| [*13] COGS | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|
| Aluminum | $616,024 | $555,871 | $660,918 | $676,625 |
| PET #1 (plastic) | 579,615 | 572,323 | 654,253 | 721,099 |
| HDPE (plastic) | -0- | 32,194 | 32,831 | 36,729 |
| Other plastics | 42,036 | -0- | -0- | -0- |
| Glass | 239,012 | 233,531 | 286,171 | 273,166 |
| Scrap | -0- | -0- | 38,855 | 57,395 |
| Total | 1,476,686 | 1,393,918 | 1,673,028 | 1,765,013 |
| Total per return | 88,507 | 163,785 | 135,960 | 283,357 |
| Adjustment | (1,388,179) | (1,230,133) | (1,537,068) | (1,481,656) |

RA Chiu's investigation further revealed that petitioner made numerous and large wire transfers to Mexico in 2007 and 2008. Petitioner wired to his wife over $300,000 in 2007 and over $100,000 in 2008. In addition, petitioner wired to his own bank account in Mexico over $10,000 in 2007 and over $15,000 in 2008. Finally, in 2008 petitioner also wired $6,000 to Juana Duran Garcia and $4,000 to Jovita Felix Camacho.

C.   Audit Results

On February 3, 2012, respondent issued to petitioner a notice of deficiency for the years at issue. In addition to the gross receipt and COGS adjustments discussed above, the notice of deficiency made a number of adjustments to petitioner's itemized deductions, expenses reported on Schedule C, Profit or Loss

**[\*14]** From Business, self-employment tax, rental income, and child tax credit. Respondent determined petitioner's taxable income, tax, deficiencies, and penalties for the years at issue as follows:

|  | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|
| Taxable income |  |  |  |  |
| Per exam | $450,163 | $460,363 | $525,170 | $483,612 |
| Per return | 8,051 | 11,277 | 25,576 | 11,902 |
| Tax liability |  |  |  |  |
| Per exam | 158,776 | 162,673 | 186,523 | 171,461 |
| Per return | 5,123 | 6,098 | 9,059 | 7,242 |
| Deficiency | 153,845 | 156,575 | 117,464 | 164,219 |
| Fraud penalty | 115,384 | 117,431 | 129,012 | 119,302 |

OPINION

Respondent argues that petitioner is liable for the section 6663 fraud penalties for the years at issue. Fraud is an intentional wrongdoing on the part of the taxpayer with the specific purpose of evading a tax believed to be owing. Edelson v. Commissioner, 829 F.2d 828, 833 (9th Cir. 1987), aff'g T.C. Memo. 1986-223; Akland v. Commissioner, 767 F.2d 618, 621 (9th Cir. 1985), aff'g T.C. Memo. 1983-249. A penalty equal to 75% of the underpayment will be imposed if any part of the taxpayer's underpayment of Federal income tax is due to fraud.

**[\*15]** Sec. 6663(a).  Further, if any portion of the underpayment is attributable to fraud, the entire underpayment will be treated as attributable to fraud unless the taxpayer establishes by a preponderance of the evidence that part of the underpayment is not due to fraud.  Sec. 6663(b); see Foxworthy, Inc. v. Commissioner, T.C. Memo. 2009-203, aff'd, 494 Fed. Appx. 964 (11th Cir. 2012).

Respondent has the burden of proving by clear and convincing evidence that an underpayment exists for each of the years at issue and that some portion of the underpayment is due to fraud.  See secs. 7454(a), 6663(a); Rule 142(b); Clayton v. Commissioner, 102 T.C. 632, 646 (1994).

I.    Existence of Underpayment

Petitioner's underpayment of tax arises primarily from his unreported income from Cash for Cans.  In the Court of Appeals for the Ninth Circuit, to which this case is appealable absent the parties' stipulation to the contrary, see sec. 7482(b), the Commissioner's determination as to unreported income in a notice of deficiency is presumed correct when it is supported by a minimal evidentiary foundation, Weimerskirch v. Commissioner, 596 F.2d 358, 360-361 (9th Cir. 1979), rev'g 67 T.C. 672 (1977); see also Delaney v. Commissioner, 743 F.2d 670, 671 (9th Cir. 1984) (stating that the Commissioner must produce some substantive

[*16] evidence demonstrating that the taxpayer received unreported income), aff'g T.C. Memo. 1982-666.

On the basis of the record, we find that respondent has produced sufficient evidence to establish that petitioner failed to report gross receipts of over $1.8 million for 2005, $1.6 million for 2006, $2 million for 2007, and $1.9 million for 2008. In addition, respondent has established that petitioner had taxable income of $450,163 for 2005, $460,363 for 2006, $525,170 for 2007, and $483,612 for 2008. To put things in perspective, petitioner reported on his returns only 1.8%, 2.4%, 4.9%, and 2.5%, respectively, of his taxable income for the years at issue.

Petitioner concedes the deficiencies set forth in the notice of deficiency. Stated another way, petitioner concedes that he paid only 3.2%, 3.7%, 4.8%, and 4.2%, respectively, of his tax liability for the years at issue. Thus, respondent has shown by clear and convincing evidence that an underpayment of tax exists for each of the years at issue.

II.    Fraudulent Intent

Fraud is never presumed but must be established by independent evidence that establishes fraudulent intent. Edelson v. Commissioner, 829 F.2d at 832; Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Direct evidence of fraud is seldom available, however, and its existence may therefore be determined from the

[*17] taxpayer's conduct and the surrounding circumstances. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971).

Courts have developed several indicia or "badges of fraud" from which fraudulent intent can be inferred. These badges of fraud include: (1) understatement of income; (2) inadequate records; (3) failure to file tax returns; (4) concealment of assets; (5) failure to cooperate with tax authorities; (6) filing false documents; (7) failure to make estimated tax payments; (8) engaging in illegal activity; (9) attempting to conceal illegal activity; (10) dealing in cash; (11) implausible or inconsistent explanations of behavior; and (12) a pattern of conduct that evidences an intent to mislead. Spies v. United States, 317 U.S. 492, 499 (1943); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), aff'g T.C. Memo. 1984-601. Although no single factor is necessarily sufficient to establish fraud, a combination of several of these factors may be persuasive evidence of fraud. Bradford v. Commissioner, 796 F.2d at 307-308; Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992).

Several badges of fraud exist in this case which clearly and convincingly establish fraud for all of the years at issue.[6]

---

[6]Although dealing in cash is ordinarily a badge of fraud, Cash for Cans paid its customers in cash as part of its business model. Therefore, under the facts and

(continued...)

**[\*18]** A.     <u>Understatement of Income</u>

Petitioner failed to report over $1 million dollars of gross receipts for each of the years at issue. <u>See</u> <u>supra</u> section I.  On his returns, petitioner reported taxable income of only $8,051 for 2005, $11,277 for 2006, $25,576 for 2007, and $11,902 for 2008.  This reflected only 1.8%, 2.4%, 4.9%, and 2.5%, respectively, of his true taxable income.

Petitioner knew that his income was substantial.  First, petitioner supported himself, his wife, and her four children with his income.  Petitioner also provided support to Rocio Sanchez in 2006 and 2007.  Second, petitioner made over $2,000 a month (over $24,000 a year) in home mortgage payments alone.  Third, petitioner purchased with cash a $130,000 house in Mexico during the years at issue.  We do not believe that petitioner could sustain his lifestyle on the meager income reported on his returns unless he had other nontaxable sources of income, which the record does not reveal.  We therefore find that petitioner knowingly and intentionally reported only a tiny fraction of his true income for each of the years at issue.

[6](...continued)
circumstances of this case, we do not treat dealing in cash as a badge of fraud.

**[*19]** B.     Concealment of Assets

Petitioner attempted to conceal assets from respondent.  During his summons interview petitioner represented that he did not have any foreign bank accounts or any other foreign assets.  Later, petitioner admitted that he had a bank account in Mexico but represented he wired only $500 to $1,000 to that account.  Bank records show that petitioner wired to his Mexican account over $10,000 in 2007 and over $15,000 in 2008.  Petitioner also admitted to wiring over $130,000 to his wife for the purchase of a house in Mexico.  Bank records show that petitioner wired to his wife over $300,000 in 2007 and $100,000 in 2008.

C.     Failure To Cooperate With Tax Authorities

Petitioner did not fully cooperate with respondent during the audit.  First, although he agreed to one interview, petitioner refused any further interviews.  Respondent, therefore, had to summon petitioner to appear for further questioning.

Second, petitioner did not voluntarily provide respondent with documentary evidence.  Cash for Cans maintained detailed and comprehensive books and records, as required by California law.  However, petitioner produced these documents only in response to respondent's summons.  As a result, respondent had to request information directly from Anheuser-Busch and Western Strategic.

[*20] Finally, respondent was forced to subpoena Bank of America for information pertaining to petitioner's home mortgage.

###### D.    Implausible or Inconsistent Explanations of Behavior

Petitioner argues that Ms. Robles "prepared grossly erroneous income tax returns" using numbers that she had "fabricated". Petitioner further argues that on audit, Ms. Robles "deftly steered Respondent to the conclusion that Petitioner had caused her to prepare fictitious returns."

Petitioner's explanation for his understatements of income is unconvincing, implausible, and inconsistent with the record evidence. Ms. Robles had no incentive, financial or otherwise, to underreport petitioner's income. Moreover, the tax returns that Ms. Robles prepared are consistent with petitioner's City of Oakland business tax declarations, which petitioner had personally prepared and filed beforehand. In response, petitioner blames Mr. Hodgson for "unwittingly assisting Petitioner to prepare erroneous City of Oakland Business Tax Declarations." Mr. Hodgson, however, credibly testified that the City of Oakland does not verify the accuracy of reported tax information and that he took petitioner's numbers at "face value". In addition, Ms. Robles credibly testified that when she told petitioner that Cash for Cans' materials summaries did not reconcile with its Oakland business tax declarations, he instructed her to use the

[*21] numbers from the Oakland business tax declarations on his Federal income tax returns. Finally, petitioner admitted during his summons interview that he provided Ms. Robles with the income information for his Federal income tax returns. On the basis of the record, we find that petitioner, not Ms. Robles, fabricated the information on his returns.

E.  Pattern of Conduct Evidencing an Intent To Mislead

Petitioner engaged in a pattern of conduct evidencing an intent to mislead respondent for each of the years at issue. Cash for Cans kept detailed and comprehensive books and records in accordance with California law. Petitioner, however, elected to estimate his income, rather than relying on Cash for Cans' business records. Petitioner purported to base his estimates upon Cash for Cans' materials summaries. The materials summaries, however, were merely a ruse petitioner used to obfuscate his true income. For instance, Cash for Cans' 2007 materials summary evidences gross receipts of over $1.2 million. In contrast, petitioner "estimated" gross receipts of only $398,467 purportedly on the basis of the 2007 materials summary. As another example, Cash for Cans' 2008 materials summary evidences gross receipts of over $1.7 million. In contrast, petitioner "estimated" gross receipts of only $284,279 purportedly on the basis of the 2008 materials summary.

[*22] Petitioner provided the materials summaries to Ms. Robles, but did not provide her with Cash for Cans' business records. In addition, when Ms. Robles realized that the information petitioner provided was inconsistent, he instructed her to use his "estimated" figures from Cash for Cans' Oakland business tax declarations.

Petitioner's treatment of business income sharply contrasts with his treatment of business expenses. Petitioner instructed Rocio Sanchez to track all of Cash for Cans' business expenses. She complied by entering all of Cash for Cans' expenses into an accounting computer program and using the program to generate annual expense summaries. Petitioner provided Ms. Robles with these expense summaries to prepare his Federal tax returns.

Petitioner alleges that the inaccuracies in his tax returns were due to his inability to read an income tax return, his "low proficiency in English", and his "rudimentary education". These alleged shortcomings, however, did not prevent petitioner from reporting reasonably accurate business expenses for the years at issue. Petitioner's contention is without merit.

In conclusion, several badges of fraud are present in this case. Considering all the facts and circumstances, we find that respondent has proven by clear and convincing evidence that petitioner fraudulently intended to evade taxes.

**[\*23]** Accordingly, petitioner is liable for the section 6663 fraud penalties for all of the years at issue.

III.    Reasonable Cause

We now turn to the reasonable cause defense. The fraud penalty does not apply to any portion of an underpayment if a taxpayer shows that there was reasonable cause for, and that the taxpayer acted in good faith with respect to, that portion. Sec. 6664(c)(1). The determination of whether a taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including the taxpayer's efforts to assess his or her proper tax liability, the knowledge and experience of the taxpayer, and the reliance on the advice of the professional. Sec. 1.6664-4(b)(1), Income Tax Regs. Reasonable cause may exist where a taxpayer relies upon professional advice if the taxpayer proves by a preponderance of the evidence that: (1) the adviser was a competent professional who had sufficient expertise to justify the taxpayer's reliance on him; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

**[*24]** Petitioner argues that he qualifies for the reasonable cause defense because he relied upon Ms. Robles to prepare his returns for the years at issue. Petitioner further argues that his reliance is justified because he has only "a third grade education" and is "functionally illiterate both in Spanish and English". We disagree.

Generally, the responsibility to file accurate returns and pay tax when due rests upon the taxpayer and cannot be delegated. Pritchett v. Commissioner, 63 T.C. 149, 173-175 (1974); Kooyers v. Commissioner, T.C. Memo. 2004-281. Petitioner has introduced no evidence regarding Ms. Robles' credentials, including any evidence that she is a California licensed tax return preparer, as he alleges. Rather, the record reflects that Ms. Robles did not finish college and that she is not a C.P.A. Accordingly, petitioner has failed to prove that Ms. Robles was a competent tax adviser.

More importantly, petitioner failed to provide Ms. Robles with Cash for Cans' books and records and knowingly provided her with erroneous information instead. We therefore find that petitioner did not rely on Ms. Robles' "judgment", nor did he act in good faith. Petitioner has failed to prove that he had reasonable cause within the meaning of section 6664(c). Accordingly, we sustain

**[*25]** respondent's determination that petitioner is liable for the section 6663 fraud penalties for all of the years at issue.

In reaching our holdings, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.